UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

      Plaintiff,

v.

WILLIAM BEAUMONT
HOSPITAL d/b/a BEAUMONT
HEALTH SYSTEM,

      Defendant.
_____ /

Case No. 23-cv-11560

Hon. F. Kay Behm
United States District Judge

**OPINION AND ORDER ON MOTIONS FOR SUMMARY
JUDGMENT (ECF Nos. 17, 18)**

## I.  PROCEDURAL HISTORY

This is an employment case brought by the Equal Employment

Opportunity Commission ("EEOC" or "the Commission") on June 28,

2023, on behalf of Megan Shefke ("Shefke"), a former Unit Shift Lead

(Charge Nurse) at William Beaumont Hospital ("Beaumont") in Wayne,

Michigan.  Shefke was employed by Beaumont from May 2017 to

January 2020, when she resigned to take a different job.  The EEOC

alleges that Beaumont violated the Americans with Disabilities Act

("ADA") by failing to reassign Shefke to a vacant position for which she

1

was qualified.  This matter is before the Court on the parties' cross

motions for summary judgment.

Discovery was completed on or about July 1, 2024.  Both parties

moved for summary judgment on the basis of liability (ECF No. 17,

Defendant's/Beaumont's Motion for Summary Judgment; ECF No. 18,

Plaintiff's/EEOC's Motion for Partial Summary Judgment (as to

liability only)).  Both motions have been fully briefed.  *See* ECF No. 20

(Beaumont's Response to EEOC's Motion); ECF No. 21 (EEOC's

Response to Beaumont's Motion); ECF No. 22 (Beaumont's Reply on its

own Motion); ECF No. 23 (EEOC's Reply on its own Motion).  The court

held a hearing on December 18, 2024, at which all parties were present.

For the reasons explained in detail below, the court **GRANTS**

each motion in part and **DENIES** them in part.

## II.    FACTUAL BACKGROUND

Megan Shefke ("Shefke") suffers from Fabry disease, a condition

that causes her body to make too little of an enzyme to keep a fatty

substance, GL-3, from building up in her body and causing problems

with her heart.  ECF No. 20, PageID.632 (admissions).[1]  Because of the
disease, she has pain in her hands and feet, which varies with
temperature and activity, extreme fatigue, and an enlargement of the
left ventricle of her heart caused by the build-up of GL-3.  *Id.*  She also
suffers from pain flares that leave her unable to work at all.  *Id.*
Shefke's condition can only be treated and managed, as it is progressive
and is worsening over time.  *Id.*  Rest and recuperation are necessary
for managing her symptoms.  *Id.*; *see also* ECF No. 18-8, PageID.423-24
(3/5/2018 Medical Inquiry Form); ECF No. 18-14, PageID.440-41
(6/3/2019 Medical Inquiry Form).  Shefke takes medication which slows,
but does not reverse, the progression of her disease.  ECF No. 20,
PageID.632.

When Beaumont hired Shefke in 2017, she had over fifteen years
of experience as a nurse, including eleven at the Veterans'
Administration (VA).  ECF No. 20, PageID.632; ECF No. 18-4,
PageID.374 (Shefke Resume).  Shefke started working as a Clinical

---

[1] Plaintiff cites also to her deposition, particularly ECF No. 18-2, PageID.341-42 (Shefke Dep.), but the facts here are admitted by Defendant, and the court cites directly to Defendant's admissions when applicable.  The court also cites to Plaintiff's admissions when helpful to establishing undisputed facts.

3

Nurse unit shift lead for Beaumont at the Wayne facility on May 15, 2017.  ECF No. 20, PageID.632.

As a Unit Shift Lead, Shefke was responsible for a range of supervisory and patient care duties, including overseeing the other nurses in her unit and assisting with scheduling and delegation, while also providing hands-on patient care.  ECF No. 21, PageID.664.  The parties disagree slightly about the exact breakdown of supervisory versus patient care duties, but Shefke testified that about 60% of Shefke's job duties were dedicated to oversight duties and 40% involved direct patient care.  *See* ECF No. 21, PageID.664; ECF No. 18-2, PageID.346 (Shefke Dep.).  At times, Shefke was one of only two Unit Shift Leads on the day shift; at other times, she was the only one.  Like Shefke, the other Unit Shift Lead worked three 12-hours shifts per week and every other weekend.  And when there was no other Shift Lead and Shefke was not at work, other nurses took on her shift lead duties.  ECF No. 18-2, PageID.346 (Shefke Dep. at 47-49).

A)      **Timeline of Accommodations Requests**

In February 2018, Shefke made her first request for accommodation – that that her schedule be reduced from three 12-hour

4

shifts (36 hours) to four 8-hour shifts (32 hours) per week due to her

Fabry Disease.  ECF No. 21, PageID.664; ECF No. 17-4, PageID.118

(3/5/2018 Medical Inquiry Form).  In early April 2018, Beaumont

approved Shefke's requested accommodation.  *See* ECF No. 21,

PageID.664.  This meant another nurse had to cover Shefke's Unit Shift

Lead duties during the four-hour period that Shefke was not there.  *Id.*;

*see also* ECF No. 21-2, PageID.693 (Shefke testimony describing unit

coverage).  Shefke also applied for and received intermittent leave

under the Family and Medical Leave Act ("FMLA") in May 2018.  ECF

No. 21, PageID.665.  Defendant does not argue that these

accommodations (that they admittedly approved) were unreasonable.

In February 2019, Shefke made a second accommodation request,

this time to request that her hours be further reduced from 32 hours per

week to 24 hours per week and that she be permitted to work occasional

four-hour shifts.  *Id.*  Shefke told Beaumont that she was "physically

struggling under [her] current schedule," and Shefke mentioned that

she had previously been granted an accommodation that limited her to

32 hours per week.  *Id.*  Kelly Fildew, a former Human Resources

Administrator at Beaumont's Wayne Hospital, explained to Shefke that

5

after consulting with Shefke's supervisor, Beaumont was not able to grant her request because it would place an undue hardship on the unit, citing staffing concerns.  ECF No. 21, PageID.665.  According to Beaumont, this was because there was already a gap in Shefke's schedule, so reducing her schedule to three 8-hour shifts would create another gap that would have to be filled by other nurses in the unit.  *Id.* Again, the rationale of that decision is not at issue in this case; the EEOC does not argue that Beaumont ought to have reduced Shefke's schedule by another eight hours.  *Id.*  The present dispute centers only on what came next.

Because Beaumont would not grant her second reduced hours accommodation request, Fildew told Shefke that her options were to instead 1) use FMLA leave, 2) apply for a medical leave or continuous leave of absence based on her health condition, 3) apply for a personal leave of absence of up to 30 days, 4) take up to 30 minutes of extra breaks per day, or 5) "apply for open positions within our Wayne campus or other Beaumont Health sites that are part-time status."  *See* ECF No. 20, PageID.636; ECF No. 21, PageID.665; ECF No. 17-6, PageID.125 (email chain).  Starting around that time (February 2019),

6

Shefke decided to use her approved FMLA leave intermittently. ECF

No. 20, PageID.636; ECF No. 17-17, PageID.196 (Shefke Dep.). As a

result, between February to April 2019, Shefke took approximately one

to two days off each week (working 16 to 24 hours per week on her

reduced schedule). ECF No. 18-11, PageID.432-33 (email from Shefke

to Fildew); ECF No. 17-17, PageID.197 (Shefke Dep. at 88).

Because of the difficulty managing in her full-time role while

using FMLA leave, Shefke also began to apply to part-time positions

within the Beaumont Health system (as Fildew had indicated she

could). On April 14, 2019, Shefke sent Fildew an email titled "ADA

Accommodation," requesting placement into a part-time job within

Beaumont due to her worsening physical limitations while working as a

unit shift lead. She specifically identified a part-time care management

job (Care Coordinator, position #30111350) for which she had already

applied:

> I just want to make you aware that I am having a
> great deal of difficulty managing in my current
> role. I have had to call in 1 to 2 days per week
> due to the exhaustion I feel. Having a patient
> assignment in addition to the charge duties, it
> [sic] simply too much for me to manage many
> days. Since I asked for, and was denied an 8 hour
> 3 [days] per week reduction in my hours, I would

7

like to be placed into a part-time position that
allows me to fulfill my duties without needing
multiple call-ins to manage.  I have applied for a
care management position at Beaumont
Farmington (position #30111350).  Please let me
know what I need to do moving forward.  Thank
you for your attention to this matter.

ECF No. 18-11, PageID.432-33; ECF No. 18-20, PageID.623 (Portal Job

Search Notifications).

Fildew forwarded Shefke's interest in the position to Amanda

Lockwood, the Manager of Recruitment at the Beaumont Service

Center, to make her aware that Shefke was interested in the care

management position at Farmington Hills, as well as other part-time

positions.  ECF No. 18-12, PageID.436 ("Megan is a FT [full time] Nurse

here at Wayne and looking to go PT [part time] as soon as possible as

she is no longer able to continue fulltime.  If she could be scheduled for

interviews for anything she meets the qualifications for that would be

helpful.").  Fildew also told Shefke that she reached out to the

recruitment manager.  ECF No. 18-11, PageID.432 ("I have reached out

to the manager over recruitment at the Beaumont Service Center so

they are in the loop that you['re] interested in transferring.").  Lockwood

looped in Kevin Claxton, Talent Acquisition Consultant, as he was the

8

recruiter for that position.  ECF No. 18-12, PageID.435 ("Kevin-can you please review Megan's app and send her to the hiring manager if she meets the requirements?").

Claxton, however, replied to Fildew and said that the manager for the Care Coordinator position already had two other candidates in mind.  *Id.*  Claxton then indicated, however, that he had found five other positions for which Shefke was apparently qualified.  *Id.*  To do so, Claxton accessed Shefke's application for the Care Coordinator position on Beaumont's applicant tracking system and used it to create the list of alternative, vacant positions.  ECF No. 18-13, PageID.437 (Claxton Dep.).  Claxton's email to Fildew listed these jobs.  ECF No. 18-12, PageID.435.  Claxton described these vacancies as "non-bedside"[2] part-time positions, which fit Shefke's interests based on her application, and resolved her concerns about physical difficulty with patient care.  ECF No. 18-13, PageID.437 (Claxton Dep.).

Fildew asked Claxton to add Shefke to the interview schedule for these positions.  ECF No. 18-12, PageID.434.  Claxton did not do that.  Instead, he responded by stating that although Shefke could be

---

[2] "Non-bedside" means the nurse will not have direct bedside patient care.

9

considered for all of the positions identified in his email, "she needs to let us know which she would be interested in and *the best way to do this is by applying*." *Id.* (emphasis added). On the morning of April 16, Fildew responded to Shefke's April 14 email by introducing Shefke to Claxton. ECF No. 18-11, PageID.432. Fildew stated that Claxton "is a recruiter at the Beaumont Service Center who is recruiting for areas you may be interested in. Kevin would be able to discuss current openings or options that are available. Feel free to send him an email directly to discuss the areas you're interested in pursuing." *Id.*

One note on this list of positions that Beaumont identified as possible "fits" for Shefke: it appears to have never been shared with Shefke. The EEOC says that neither Claxton nor Fildew shared or discussed the list with Shefke, as they both expected the other person to do so. *See* ECF No. 18, PageID.320 (citing ECF No. 18-12, PageID.434 (Emails between Fildew and Claxton)). In the Commission's version of events, Shefke followed up with Claxton by phone, but he merely told her how to apply for positions within the Beaumont system – but did not tell her to apply to those specific positions. *See* ECF No. 21-2, PageID.699 (Shefke Dep.) ("I recall that I called him and essentially

10

was told where to find the jobs, like, online and just to apply.").
Defendant disputes the conclusion that neither Claxton nor Fildew
shared or discussed available jobs with Shefke, but admits that "it does
not appear that Claxton shared the 'list' with Shefke."  ECF No. 20,
PageID.638.

The point is that Shefke and Claxton spoke by phone (the court
assumes, based on the parties' framing, that the conversation happened
that same day).  *See* ECF No. 17, PageID.89 ("After receiving Fildew's
email, Shefke contacted Claxton.").  Beaumont emphasizes that the
reason Claxton never shared a list of positions or "only described the
process for transferring" generally is that Shefke "(i) never told him
that she was seeking a transfer to a new position as an accommodation,
(ii) never mentioned anything about Fabry Disease, or (ii) never asked
him for help applying for a specific job."  ECF No. 20, PageID.641 (citing
ECF No. 18-2, PageID.353, 358, ECF No. 17-17, PageID.208 (excerpts
from Shefke Dep.)).  The EEOC points out that the emails between
Fildew and Claxton regarding Shefke all bear the same subject line:
"ADA Accommodation" or "RE: ADA Accommodation."  *See* ECF No. 18-
12, PageID.434.

11

Also on April 16, 2019, (the same day Fildew told her to speak to
Claxton), and presumably after communicating with Fildew and
Claxton, Shefke applied for two additional internal transfers: a second
Care Coordinator position (No. 30115849) ("CCB") and a Quality
Improvement RN position (No. 30102853) ("QIRN"), both of which had
appeared on Claxton's list.  *See* ECF No. 17-15, PageID.164-66
(outcomes of Shefke's applications); ECF No. 17-8, PageID.134
(Claxton's list).  Shefke also replied to Fildew's email giving her
Claxton's contact information and renewed her request to be placed in
an open position: "I am officially asking Beaumont to place me into an
open position that I am qualified for.  This is a fair expectation under
the ADA."  ECF No. 18-11, PageID.431.

Fildew and Shefke spoke again on April 19 to discuss Shefke's
request for a transfer to another role. ECF No. 17-17, PageID.200
(Shefke Dep.); ECF No. 17-18, PageID.235 (Fildew Dep.); ECF No. 18-
11, PageID.431 (Email summarizing conversation).  Shefke reiterated
her request to transfer to a part time role as an accommodation.  ECF
No. 18-11, PageID.431.  Fildew advised Shefke that she needed to have
her doctor complete some paperwork explaining her need for fewer

12

hours and fewer physical demands, so they could better assist her in finding a new position. *Id.* Fildew also reiterated that she would work with Shefke to "expedite" the transfer process once she had her medical documentation. *Id.*

In May, June, and July of 2019, Shefke applied to several other part-time nursing positions within the Beaumont system. ECF No. 21, PageID.668; ECF No. 17-17, PageID.204 (Shefke Dep.). Shefke did not inform Fildew, Claxton, or anyone else in HR or Talent Acquisition that she had applied to these positions (though the EEOC disputes that she was required to, given what she was told by Fildew and Claxton). ECF No. 21, PageID.668-69; ECF No. 17-17, PageID.206 (Shefke Dep.). Other than the Farmington Hills care coordinator position, Shefke never sent an email to any of these individuals identifying specific positions that she was interested in and never asked for help obtaining specific positions; she did, however, continue to apply. *See* ECF No. 17-17, PageID.208 (Shefke Dep. at 133). Shefke was not hired for any of these positions.

Shefke submitted the paperwork from her doctor that Fildew had requested on June 3, 2019. ECF No. 18-14, PageID.439-442 (Medical

Inquiry Form).  Fildew and Shefke met in-person on June 7, 2019.  ECF No. 18-15, PageID.443-45.  Summarizing the meeting, Shefke noted that she was expected to find, apply, and interview for open positions (ECF No. 18-15, PageID.444-45), and in her reply Fildew stated that assistance would be offered for the interview process.  ECF No. 18-15, PageID.443.

Shefke also applied for a Clinical Nurse position in the POHA/PACU department at the Wayne Hospital on June 8, 2019.  ECF No. 17, PageID.93.  Shefke informed Fildew about this, ECF No. 17, PageID.94 n.4, and in her email replying to Shefke, Fildew stated that "our Talent Acquisition team has reviewed your information and shared your applicant information with the hiring manager of for [sic] further consideration."  ECF No. 18-15, PageID.443.

On September 26, 2019, Shefke obtained, on her own (without informing HR or Talent Acquisition and without any preference due to her request for accommodation), a part-time nursing position at Beaumont's Infusion Clinic in the Hematology/Oncology department in Dearborn, Michigan.  ECF No. 20, PageID.647.

14

Although not relevant to the issues in this motion, Shefke no longer works for Beaumont; on January 31, 2020, Shefke resigned from her position at the Infusion Clinic in order to take a job with Michigan Medicine.  ECF No. 21, PageID.672.

## B)   Results and Relevance of Shefke's Internal Transfer Applications

Beaumont alleges that their hiring process gives preference to internal applicants who are requesting a transfer as a form of accommodation.  Fildew testified that as long as Shefke met the requirements for the job and her restrictions could be accommodated, and that there was a "fit," she would be at the "top of the pile" and transferred to the position she applied for.  ECF No. 17-18, PageID.227, 237.  Although this still left room for a hiring manager to reject an applicant despite a pending request for accommodation, in this sense Beaumont argues that its application process was not competitive.  ECF No. 17, PageID.93.  Fildew testified that the interviews for these positions are "meet and greets" designed to ensure that Shefke both wanted and could perform the duties of the position she applied for. ECF No. 17-18, PageID.235 (Fildew Dep.).

15

However, Shefke was not selected for any of the jobs she applied for, though she interviewed for several different roles.

The timeline outlined above reflects a number of positions that Shefke applied to, but only five are ultimately relevant to this case. Some of her applications are irrelevant on the basis that no one was hired for those positions at all; the openings were cancelled by Beaumont and were therefore never truly available under the meaning of the ADA (Nos. 30120154 (Care Coordinator), 30114617 (Clinical Nurse), 30114772 (Transfer Center Nurse)).  *See* ECF No. 17-15, PageID.163.  One application was for a position for which Beaumont did hire another candidate, but that person was hired in February 2020 (after Shefke left Beaumont); the position was on hold at the time Shefke applied and thus was not available during any relevant period (No. 30117860 (Care Coordinator)).  *Id.* at PageID.164-65.  The court ignores one application because the EEOC apparently concedes that Shefke was not qualified for the position and does not argue that the application is at issue in this case (No. 30118502 (Clinical Nurse)).  *See* ECF No. 17-15, PageID.166 ("The job posting indicated that a minimum 5 years of critical care experience was required and the experience must

16

have been within the last 3 years"); ECF No. 21, PageID.676 (the Commission stating, "There are four vacant positions at issue," and not listing this position).

That leaves the court with a total of five positions to which Shefke applied that are relevant to the arguments presented.  For each of these positions, Beaumont ultimately hired another person; Shefke was not selected despite the alleged "meet and greet" interview process for tranfers on the basis of an accommodation.  As later explained, with one exception, Beaumont does not dispute that Shefke was qualified for these positions.  For each, the hiring manager was not made aware (by either Shefke or Beaumont) that Shefke was seeking the position as an accommodation for her disability.[3]  ECF No. 17-15, PageID.164-167 (answers to interrogatories).  The exact reasons vary.  For ease of reference, the court collects these positions here, and follows this list with a more detailed accounting of each outcome:

---

[3] Except, possibly, the POHA/PACU position, though that fact is not relevant for purposes of this motion.

17

## Table 1: Disputed Internal Vacancies to which Shefke Applied[4]

| Position # | Position Title | Outcome of Shefke's Application |
|---|---|---|
| 30111350[5] | Care Coordinator ("CCA") | Applied 4/5/19. Shefke was not offered an interview, allegedly on the basis that the position was closed. |
| 30102853[6] | Quality Improvement RN ("QIRN") | Applied 4/16/19. Shefke was interiewed but not hired. |
| 30115849[7] | Care Coordinator ("CCB") | Applied 4/16/19. Shefke was interviewed but not hired. |
| 30100586[8] | Clinical Nurse ("POHA/PACU" position) | Applied 6/8/19. Shefke was offered an interview on 6/17/19, but withdrew from consideration on 6/27/19. |
| 30118217[9] | Clinical Nurse ("CN") | Applied 7/23/19. Shefke was interviewed but not hired. |

---

[4] ECF No. 18-20, PageID.622.  The openings are arranged here by the date Shefke applied rather than by the vacancy number.

[5] The CCA role was the "original" Care Coordinator position that Shefke applied to when she reached out to Fildew.

[6] The QIRN position appeared on Claxton's list of possible fits for Shefke.  ECF No. 17-8, PageID.134.

[7] The CCB position also appeared on Claxton's list.  ECF No. 17-8, PageID.134; *see also* ECF No. 17-15, PageID.166.

[8] The parties dispute the relevance of the POHA/PACU position.  The court includes it here as one among several disputed job openings.  *See* ECF No. 17-13, PageID.155 (emails related to interview offer).

[9] *See* ECF No. 17-15, PageID.166-67.

18

As to the original care coordinator position (CCA) that she applied to, Shefke was not offered an interview and was notified that she was not selected by an automated message.  ECF No. 18, PageID.322. Instead, Beaumont argues that the hiring manager allegedly had "two people that she [was] considering," and Claxton testified that meant the role was closed.  ECF No. 17-8, PageID.134 (Claxton email) ("the manager has two people that she is considering").  He later clarified in his deposition that based on that statement, "the position, for all intents and purposes, is closed and so . . . it would be safe to assume that we had provided her additional positions to review because that particular role is closed."  ECF No. 17-19, PageID.255 (Claxton Dep.).  Beaumont selected an internal candidate with no known physical or mental impairment.  ECF No. 20, PageID.641; ECF No. 18-17, PageID.456.

As to the QIRN position, the EEOC alleges that Claxton handled the recruitment process.  *See* ECF No. 17-19, PageID.258 (Claxton Dep. at 38:21-22) ("I handled the nursing roles, most of the nursing roles that did not require bedside [experience or work].").  Exhibits attached to their motion show at least some messages going to Claxton about applicants for this position, including about Shefke's application and

interview process.  ECF No. 18-19, PageID.492.  Shefke interviewed and

was scheduled for a second interview, but was not hired for the position

(instead receiving the form rejection email).  ECF No. 20, PageID.646

(admitting these allegations as to this position, though the EEOC's brief

cited these facts in relation to another job opening); ECF No. 17-14,

PageID.158 (status of each application).  Beaumont alleges that the

most qualified candidate was selected for the position.  ECF No. 20,

PageID.646.

   As to the CCB position, Claxton also allegedly handled that

recruitment process (as a non-bedside role), though unlike with the

QIRN position, no exhibits appear to connect him specifically to this

position.  Beaumont also filled that role with an external candidate who

did not need an accommodation and who they allege was the most

qualified candidate.  ECF No. 18-17, PageID.457.  Beaumont further

alleges the person they hired had the "requisite Care Management

experience" as compared to Shefke.  ECF No. 17-15, PageID.166

(answer to interrogatory).

   For the POHA/PACU position, upon learning of Shefke's

application, Fildew contacted Kathy Curry, who was the hiring

manager for the position, and informed her that Shefke had applied.
ECF No. 21, PageID.671.  On June 17, 2019, Curry sent an email to
Shefke stating, "I have not heard back from you, I was wondering if you
are still interested in the position?  If so I would like to set up an
interview with you. Please contact me to schedule an interview as soon
as possible."  Shefke responded by stating that she was no longer
interested in pursuing the position, as she anticipated going out on
medical leave and thought it would be "unfair to switch to a new
department and then need excessive leave."  ECF No. 17-13,
PageID.155.  Curry then forwarded Shefke's email to Fildew.  Shefke
did not go on leave, but did apply to other positions.  ECF No. 21,
PageID.671.

Finally, as to the CN position, Shefke was interviewed, but that
opening "was awarded to a displaced internal RN."  Defendants did not
include the language they answered other interrogatories with that this
internal candidate was the "most qualified candidate," but nonetheless
subsequently denied "any implication that the candidate selected for
the position was not the most qualified."  ECF No. 20, PageID.646.

## III.  STANDARD OF REVIEW

21

When a party files a motion for summary judgment, it must be
granted "if the movant shows that there is no genuine dispute as to any
material fact and the movant is entitled to judgment as a matter of
law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or
is genuinely disputed must support the assertion by: (A) citing to
particular parts of materials in the record . . . ; or (B) showing that the
materials cited do not establish the absence or presence of a genuine
dispute, or that an adverse party cannot produce admissible evidence to
support the fact." Fed. R. Civ. P. 56(c)(1). The standard for
determining whether summary judgment is appropriate is "whether the
evidence presents a sufficient disagreement to require submission to a
jury or whether it is so one-sided that one party must prevail as a
matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433,
436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S.
242, 251-52 (1986)). Furthermore, the evidence and all reasonable
inferences must be construed in the light most favorable to the non-
moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
475 U.S. 574, 587 (1986).

22

Where the movant establishes the lack of a genuine issue of material fact, the burden of demonstrating the existence of such an issue shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  That is, the party opposing a motion for summary judgment must make an affirmative showing with proper evidence and must "designate specific facts in affidavits, depositions, or other factual material showing 'evidence on which the jury could reasonably find for the plaintiff.'"  *Brown v. Scott*, 329 F.Supp.2d 905, 910 (6th Cir. 2004).  To fulfill this burden, the non-moving party need only demonstrate the minimal standard that a jury could ostensibly find in his favor.  *Anderson*, 477 U.S. at 248; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  However, mere allegations or denials in the non-movant's pleadings will not satisfy this burden, nor will a mere scintilla of evidence supporting the non-moving party.  *Anderson*, 477 U.S. at 248, 251.

## IV.   ANALYSIS

The ADA prohibits an employer from discriminating against a qualified individual on the basis of disability.  42 U.S.C. § 12112(a).

23

Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability unless the accommodation would impose an undue hardship." *Id*. at § 12112(b)(5)(A). A reasonable accommodation under the ADA may include part-time work schedules and reassignment to a vacant position. 42 U.S.C. § 12111(9)(B).

To prevail on a failure-to-accommodate claim, the plaintiff must first establish (1) that she is disabled, and (2) that she is "'otherwise qualified' for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged 'essential' job requirement eliminated; or (c) with a proposed reasonable accommodation." *Fisher v. Nissan North America, Inc.*, 951 F.3d 409, 417 (6th Cir. 2020) (citations omitted).[10] The defendant then bears the

---

[10] Defendant urges the court to apply a different test, as described in another Sixth Circuit case, *Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 603 (6th Cir. 2018). *See* ECF No. 17 (stating that the EEOC must show: (1) Shefke is disabled; (2) Shefke is otherwise qualified; (3) Beaumont knew or had reason to know of Shefke's disability; (4) Shefke requested a reasonable accommodation; and (5) Beaumont failed to provide the reasonable accommodation). But *Fisher* rejected that approach (referred to as the "indirect" test) for failure to accommodate cases. *See Fisher*, 951 F.3d at 417 (citing *Mosby-Meachem* and then rejecting that approach in favor of the "direct" test as described in *Kleiber v. Honda*

24

burden of proving that a challenged job requirement is essential, or that a proposed accommodation will impose an undue hardship.  *Id.*

## A)   Shefke is disabled under the ADA

There is no genuine dispute that Shefke is disabled under the ADA.  There is ample evidence in the record to support this point; Shefke suffers from Fabry disease, a rare lifelong and progressive physical impairment of her body's metabolic function.  *See* Plaintiff's Statement of Material Facts Nos. 1, 7, ECF No. 18, PageID.314, *admitted at* ECF No. 20, PageID.632.  As a result of her condition, she suffers from pain in her hands and feet, extreme fatigue and the enlargement of the left ventricle of her heart.  *Id.*  The EEOC is entitled

---

*of Am. Mfg.*, 485 F.3d 862, 868 (6th Cir. 2007), and collecting cases); *see also Hrdlicka v. GM LLC*, 63 F.4th 555, 570 (6th Cir. 2023) (citing *Fisher* and *Kleiber* to apply the direct evidence test in failure to accommodate case).  To be fair, the Sixth Circuit is not always clear about why one test should be used over the other. *Compare, e.g.*, *Woodie v. Motorola Sols., Inc.*, No. 24-3267, 2025 U.S. App. LEXIS 5641, at *5 (6th Cir. Mar. 10, 2025) (in failure to accommodate claim, majority opinion applying the "indirect" burden shifting test), *with id.* at *18 (Mathis, J., dissenting) (dissenting opinion applying the direct test from *Fisher*).  Anyway, the point that Defendant is making – that Shefke was required to communicate her request for accommodation to prevail on her claim – is still incorporated into a later step of *Fisher*'s analysis for reassignment claims.  *See Fisher*, 951 F.3d at 419 ("[I]n the reassignment context, a plaintiff must show either that he requested, and was denied, reassignment . . . or that he requested and was denied some specific assistance in identifying jobs . . . ."); *infra* Section IV.3.C.ii (discussing the interactive process).

to summary judgment on this point because the undisputed evidence supports their position and Beaumont did not dispute these facts in their responsive briefs.  *See* Fed. R. Civ. P. 56(e); *Local No. 499, Bd. of Trs. of Shopmen's Pension Plan v. Art Iron, Inc.*, 117 F.4th 923, 933 (6th Cir. 2024) ("The movant 'always bears the burden of demonstrating the absence of a genuine issue as to a material fact'" and bears this burden whether or not the adverse party responds to that argument) (quoting citation omitted).[11]

## B)   Shefke was otherwise qualified for the vacant positions at issue

There is also no genuine dispute that Shefke was otherwise qualified for most of the positions at issue in this case.  Shefke has a master's in nursing education, as well as bachelor's and associate's degrees in nursing, when she was hired by Beaumont.  EEOC Statement of Facts, No. 9, ECF No. 18, PageID.315, *admitted at* ECF No. 20, PageID.632.  When hired, she had over fifteen years of nursing

---

[11] While counsel for Beaumont indicated at oral argument that they conceded this issue "for purposes of this motion," it is also a matter on which no reasonable jury could disagree; Beaumont had, after all, already granted one request for accommodation on the basis of her disability and presents no evidence to the contrary.  *See* ECF No. 21, PageID.664.

26

experience including in the emergency room and outpatient care.  ECF
No. 20, PageID.632 (admissions in statement of facts).  Beaumont
employed Shefke as a Clinical Nurse unit shift lead at the Wayne
facility for three and a half years.  *Id.* at PageID.632, 647.  In that role,
she had significant supervisory duties while at the same time providing
direct patient care.  *Id.* at PageID.632.  Her supervisor stated that
Shefke met her performance expectations and was never written up.
*Id*.  The EEOC makes this argument directly in their motion, *see* ECF
No. 18, PageID.330, and when Beaumont disputes Shefke's
qualifications, it generally only disputes them to the limited extent that
for certain positions, Shefke was not the *most* qualified candidate – not
that she was *un*qualified in the first place.  *See, e.g.*, ECF No. 20,
PageID.652 (arguing that "Beaumont did not refuse to transfer Shefke
to another position as an accommodation because she was not the most
qualified candidate.") (emphasis omitted); *id.* (arguing that "the ADA
permits an employer to hire the most qualified candidate, even if that
results in a qualified disabled applicant who is seeking reassignment as
an accommodation not getting the position").  To the extent that
Beaumont may still dispute this issue, given counsel's representation

27

that they conceded this point only for purposes of this motion
(specifically, counsel told the court that they are not challenging the
case generally on the basis that she's not qualified), Beaumont's
opportunity to respond to the EEOC's argument that Shefke was
qualified for most of the positions at issue has come and gone.  *See* ECF
No. 18, PageID.331 (explaining her qualifications and alleging that
"Shefke was qualified for the vacancies for which she applied"); ECF No.
20, PageID.643 (admitting that "Beaumont admits that Shefke never
asked Fildew to be placed in a position that she was not qualified for,"
and otherwise not responding to the argument); *see also, e.g.*, *Clark v.
City of Dublin*, 178 F. App'x 522, 524-25 (6th Cir. 2006) (recognizing
that the failure to respond properly to motion for summary judgment
arguments constitutes abandonment of a claim).  Beaumont did not
provide any countervailing factual allegations or evidence, except for
one limited dispute as explained below, *see infra* Section IV.C.v.c (CCB
position), that she was not qualified for the positions at issue.
Therefore, as to all positions except for the CCB vacancy, Beaumont's
failure to respond to the EEOC's argument that she was qualified, their
representations to the court that they are not challenging the case on

28

the basis that she is not qualified, and the EEOC's evidence presented on this point are sufficient to find that there is no genuine dispute of material fact that Shefke was qualified for the CCA, QIRN, and CN positions.

Further, as far as the ADA requires that the disabled employee be able to perform the essential requirements of the role "with or without reasonable accommodation," 29 C.F.R. § 1630.2(m), Shefke was applying to these part-time positions in order to accommodate her need to work fewer hours.  There is no genuine dispute that Shefke was "otherwise qualified" for these positions when by nature their work requirements were better suited to her medical needs, and when Beaumont has presented no evidence from which a reasonable jury could conclude otherwise.

**C)   Failure to Accommodate**

The ADA requires employers to "mak[e] reasonable accommodations."  42 U.S.C. § 12112(b)(5)(A); *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 868 (6th Cir. 2007).  Because there is generally no genuine dispute of fact that Shefke is disabled and was qualified for the positions at issue, this case largely turns on whether Beaumont failed to

29

provide Shefke with a reasonable accommodation in their treatment of her request for a reassignment.  The parties agree that the relevant standard is set forth in *Burns v. Coca-Cola Enters.*, 222 F.3d 247, 257 (6th Cir. 2000) and *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409 (6th Cir. 2020), though they disagree as to how to apply those cases here.  In *Burns*, the Sixth Circuit held that "an employer has a duty under the ADA to consider transferring a disabled employee who can no longer perform his old job even with accommodation to a new position within the Company for which that employee is otherwise qualified." *Burns*, 222 F.3d at 257.  An employer is not required to "reassign the disabled employee to a position for which he is not otherwise qualified," nor does the employer have to "waive legitimate, non-discriminatory employment policies or displace other employees' rights to be considered in order to accommodate the disabled individual." *Id.*

In other words, "[t]o show disability discrimination in the reassignment context, a plaintiff must show either that 'he requested, and was denied, reassignment to a position for which he was otherwise qualified' or that 'he requested and was denied some specific assistance in identifying jobs for which he could qualify.'" *Fisher*, 951 F.3d at 419

30

(6th Cir. 2020) (quoting *Burns*, 222 F.3d at 258). "If an employee requests assistance in identifying vacant positions—even a request as generic as 'I want to keep working for you—do you have any suggestions?'—then 'the employer has a duty under the ADA to ascertain whether he has some job that the employee might be able to fill.'" *Id.* at 419 (citations omitted). The employee is not required to use magic words such as "accommodation" and "disability"; rather, we ask whether "a factfinder could infer that [the interaction] constituted a request for an accommodation." *Id.* (citing *Smith v. Henderson*, 376 F.3d 529, 535 (6th Cir. 2004)). "Then, 'to overcome summary judgment, the plaintiff generally must identify the specific job he seeks and demonstrate that he is qualified for that position.'" *Id.* (quoting *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 870 (6th Cir. 2007)).

Beaumont argues that 1) Beaumont granted Shefke's request to transfer, 2) Shefke was never denied reassignment to a vacancy nor denied help finding a vacant position, and 3) Shefke was not required to compete for open positions, and even if she was, the ADA does not mandate non-competitive reassignment. ECF No. 17. Finally, as far as Shefke manages to show that she made any requests for

31

accommodation, Shefke was responsible for a breakdown of the interactive process by not putting Beaumont on notice of her applications to vacant positions.  *See* ECF No. 22, PageID.727.

The EEOC argues that 1) Beaumont failed to reassign Shefke to a vacant job for which she was qualified, 2) the ADA required Beaumont to place Shefke into a vacant position for which she was qualified, even if not the most qualified, and 3) reassigning Shefke to a vacant job for which she was qualified would not have posed an undue hardship on Beaumont.[12]  Further, the Commission argues that Beaumont's failure to provide information regarding other jobs she might be qualified for warrants denial of summary judgment as to whether they reasonably accommodated her.  ECF No. 23, PageID.735.

The court takes the case from a slightly different framing, because some of these points talk past each other.  The court proceeds in five steps: first, whether Beaumont had a duty, as a matter of law, to identify possible vacant positions for Shefke once she requested a transfer, or whether that duty only applies when an employee requests

---

[12] There is no dispute that a transfer would not have posed an undue hardship or burden on Beaumont, and so the court does not address that issue further.  ECF No. 20, PageID.654.

specific assistance finding a suitable role; second, whether Shefke as a matter of law is precluded from recovering for allegedly failing to notify Beaumont of her applications; third, whether Beaumont's failure to prioritize Shefke for the vacant positions that she applied to violates the ADA; fourth, whether Shefke's eventual transfer is relevant to Beaumont's liability; and fifth, the court applies the legal conclusions it reaches in the first four sections to each of Shefke's specific applications at issue.

One last point: multiple times, Beaumont emphasizes that "Fildew informed Shefke, . . . that she would help 'expedite the [transfer] process' once Shefke identified and applied for positions that she was interested in transferring to." *E.g.*, ECF No. 17, PageID.97. Therefore, says Beaumont, they never "denied" her request for accommodation. *See, e.g.*, ECF No. 20, PageID.647. However, the fact that Beaumont nominally "granted" her request to transfer (in that Fildew said they were willing to consider her transfer requests) is not the issue. The question is instead whether a) Beaumont actually accommodated her request for reassignment by *placing* her in a position for which she was qualified (or failing to provide specific assistance in

33

identifying and applying for vacant roles), or else b) whether their
failure to do so is absolved in some way by their alleged lack of
knowledge or constructive knowledge of her applications, or by a
breakdown in the interactive process attributable to Shefke.

> i)    *Whether Beaumont had a duty to affirmatively identify*
>       *positions for Shefke and direct her to those positions*

The parties go back and forth regarding what duty (if any)
Beaumont had to provide Shefke with a list of available positions which
she was qualified for (a list that Claxton did, in fact, generate at one
point, but that no one shared with Shefke).  ECF No. 18-12,
PageID.435; ECF No. 20, PageID.638.  Beaumont argues that they had
no duty to do so: "in failure to accommodate cases involving a request to
transfer, 'an *employee* has the burden of identifying particular positions
to which [s]he could be reassigned based on [her] qualifications.'"  ECF
No. 22, PageID.729 (emphasis added) (citing *Fisher v. Nissan North
America, Inc.*, 951 F.3d 409, 419 (6th Cir. 2020).  The EEOC's
argument, meanwhile, is that Beaumont violated the ADA when they
"failed to provide information to an employee regarding other jobs."
ECF No. 23, PageID.735 (also citing *Fisher*, 951 F.3d at 419).  The court

34

disagrees with both extremes, finding that Beaumont's duty as to whether they had to offer help in finding vacant positions is determined as a matter of law by the scope of Shefke's request – and on that factual matter, reasonable minds could disagree.

The court first puts this discussion in context. "Once an employee requests an accommodation, the employer has a duty to engage in an interactive process." *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 857 (6th Cir. 2018). From that point, "both parties have a duty to participate in good faith." *Kleiber*, 485 F.3d at 871; *Fisher*, 951 F.3d at 421. The purpose of the interactive process is to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Kleiber*, 485 F.3d at 871 (quoting 29 C.F.R. § 1630.2(o)(3)). Once the employee "establishes a prima facie showing that he proposed a reasonable accommodation," *Rorrer v. City of Stow*, 743 F.3d 1025, 1041 (6th Cir. 2014), "the employer has the burden of showing how the accommodation would cause an undue hardship." *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 202-03 (6th Cir. 2010). If the interactive process was triggered but not successfully resolved, "courts should attempt to isolate

35

the cause of the breakdown and then assign responsibility." *Kleiber*, 485 F.3d at 871 (quoting *Bultemeyer v. Fort Wayne Cmty. Schs.*, 100 F.3d 1281, 1285 (7th Cir. 1996)).  For example, though an employer is not required to propose counter accommodations, such a proposal may be "evidence of good faith." *Jakubowski*, 627 F.3d at 203.  An employer has sufficiently acted in good faith when it readily meets with the employee, discusses any reasonable accommodations, and suggests other possible positions for the plaintiff.  *Id.* (citing *Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 557 (6th Cir. 2008)).  On the other hand, "failing to assist an employee in seeking an accommodation may suggest bad faith." *Rorrer*, 743 F.3d at 1040 (citation omitted).

As an example, EEOC guidance states:

> In order to narrow the search for potential vacancies, the employer, as part of the interactive process, should ask the employee about his/her qualifications and interests.  Based on this information, the employer is obligated to inform an employee about vacant positions for which s/he may be eligible as a reassignment.  However, an employee should assist the employer in identifying appropriate vacancies to the extent that the employee has access to information about them.  If the employer does not know whether the employee is qualified for a specific position, the employer can discuss with the employee his/her qualifications.

36

*Enforcement Guidance on Reasonable Accommodation and Undue Hardship under the ADA*, U.S. Equal Emp. Opportunity Comm'n (2002), https://www.eeoc.gov/laws/guidance/enforcement-guidance-reasonable-accommodation-and-undue-hardship-under-ada [https://perma.cc/P8YX-WTFH] [hereinafter EEOC Enforcement Guidance]; *see also Mengine v. Runyon*, 114 F.3d 415, 420 (3d Cir. 1997) ("a disabled employee seeking reassignment will be best served by employer and employee working together to identify suitable positions.").

The question becomes what exactly the interactive process requires from each party, as a matter of law, when the requested accommodation is reassignment. On the one hand, Beaumont's argument at first appears to excuse itself of too much of its conduct. Plenty of published Sixth Circuit authority indicates that the ADA generally imposes an obligation on the employer (and not the employee) to identify vacant roles once a request for transfer-as-accommodation is made. *See Burns v. Coca-Cola Enters.*, 222 F.3d 247, 258 (6th Cir. 2000) ("if the employee requests accommodation the employer must make a reasonable effort to explore the possibilities"); *Kleiber v. Honda*

*of Am. Mfg.*, 485 F.3d 862, 870 (6th Cir. 2007) ("Where the requested accommodation is a job transfer, 'employers have a duty to locate suitable positions for' employees with disabilities"); *Rorrer v. City of Stow*, 743 F.3d 1025, 1040 (6th Cir. 2014) ("If a plaintiff's requested accommodation is a transfer to a different position, 'employers have a duty to locate [a] suitable position[] . . . .'"); *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 420 (6th Cir. 2020) (following a request for accommodation by transfer and help identifying jobs, "Nissan was therefore obliged . . . 'identify the full range of alternative positions for which the individual satisfies the employer's legitimate, nondiscriminatory prerequisites'; . . ."). On closer inspection, however, the trouble for Plaintiff is that each of those citations lead back to the same place. *See Fisher*, 951 F.3d at 420 (citing *Burns*, 222 F.3d at 257); *Rorrer*, 743 F.3d at 1040 (quoting *Kleiber*, 485 F.3d at 870); *Kleiber*, 485 F.3d at 870 (citing *Burns*, 222 F.3d at 257); *see also Cooper v. Dolgencorp, LLC*, 93 F.4th 360, 371-72 (6th Cir. 2024) (citing *Burns*, 222 F.3d 247).

All roads lead to *Burns*, but *Burns* alone of these cases considered what happens when an employee requests to be transferred, but the

employer has an existing, generally-applicable policy requiring employees to apply for transfers using their internal job-posting system. *Burns* held that such a system was permissible within the meaning of the ADA.  In that case, the defendant company had "a policy of posting all job openings within the company on bulletin boards so that employees may search for job vacancies at their leisure.  If an employee desires to transfer from one position within the Company to another, the employee must initiate the transfer proceeding by filing a [Transfer Request] with his or her supervisor.  If the employee is qualified for the position in which he or she is interested, the company will process the employee's Transfer Request and, if possible, effect the reassignment." *Burns*, 222 F.3d at 250.  The Sixth Circuit found that sufficient: "KCC's transfer request policy . . . is a legitimate, non-discriminatory administrative policy with which Burns, as a KCC employee, was obligated to comply." *Id.* at 258.  Thus *Burns* essentially allows an employer to shift "its responsibility to look to a 'broad range' of jobs" onto the employee if it has a "legitimate, non-discriminatory administrative policy" "requiring [an employee] to apply for a transfer to a new position within his restrictions." *See id.* at 258.  In that

39

particular situation, an employer need not look into the suitability of jobs that the employee does not apply to. *Id.* ("although KCC arguably could have . . . considered Burns for more than one vacant position despite his failure to file more than one Transfer Request, KCC's failure to do so does not constitute a violation of its duty to accommodate Burns's disability under the ADA.").

Thus, the court disagrees with the EEOC's argument that Beaumont had the responsibility to identify vacant positions (even if Shefke's request was only to transfer to a vacant position), when *Burns* accounts for a relevant exception to that general rule, and the other authority provided for the proposition that an employer must search for applicable vacant positions upon an employee's request for transfer is primarily out-of-circuit. *See* ECF No. 23, PageID.735 (citing *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685 (7th Cir. 1998), *Mashni v Bd. of Ed. of City of Chicago*, No. 15-C-10951, 2017 WL 3838039 at *17 (N.D. Ill., Sept. 1, 2017)).

On the other hand, Beaumont is wrong to wash its hands of all effort, because both *Burns* and *Fisher* describe a slightly different way that a plaintiff *can* give rise to an employer's duty to identify vacant

40

roles on the employee's behalf even if the employer generally asks employees to use their job portal to apply for postings: if "he requested and was denied some *specific assistance* in identifying jobs for which he could qualify." *Fisher*, 951 F.3d 409, 419 (6th Cir. 2020) (emphasis added) (as opposed to a more general request for "reassignment to a position for which he was otherwise qualified."). When an employee requests specific assistance "in identifying vacant positions—even a request as generic as 'I want to keep working for you—do you have any suggestions?'—then 'the employer has a duty under the ADA to ascertain whether he has some job that the employee might be able to fill.'" *Id.* at 419 (citations omitted); *see also Root v. Decorative Paint, Inc.*, No. 23-3404, 2024 U.S. App. LEXIS 22439, at *14-15 (6th Cir. Sep. 3, 2024). *Burns* suggested that its discussion of how an employer can generally shift the burden of identifying vacant positions to the employee would not apply to a *specific* request for help identifying vacancies – but the plaintiff in that case hadn't proven that was at issue. *See Burns*, 222 F.3d at 258 ("Alternatively, Burns could show, which he did not, that he requested and was denied some specific assistance in identifying jobs for which he could qualify."). To the

41

extent that Burns had made any showing on that front, the court found the employer's efforts to consider him for a position he had not applied for sufficient to fulfill their duty if he had requested such specific assistance. *See id.* ("although Burns's request for reassignment was relatively vague, KCC did make some effort to discharge its duty to ascertain whether it had some job that Burns might have been able to fill.") (cleaned up).  And the court in *Fisher*, for example, found a plaintiff's statement to his supervisor that "there has got to be something easier here" sufficient that a factfinder could say it constituted a request for assistance in identifying jobs for which he could qualify, *as well as* a request for transfer.  951 F.3d at 420.

Taken together, the court reads *Burns* and *Fisher* to set forward a rule describing, as a matter of law, what burdens an employer has in the interactive process based on what exactly is communicated by the employee.  If an employee generically requests *only* to be reassigned to a vacant position, then an employer can legitimately, in good faith and as part of the interactive process, ask the employee to first put forward vacant positions that they wish to be considered for by using an internal job listing service to identify jobs which they believe they are qualified

42

for.  But if an employee specifically requests help *identifying* vacant

positions, then an employer must in good faith do at least some

investigation into whether possible vacancies exist and propose those to

the employee as part of the interactive process, even if they otherwise

require applicants to go out and apply.  To refuse to follow up on that

request may constitute a breakdown of the interactive process for which

the employer bears responsibility, and an independent path to liability

for a plaintiff that does not necessarily depend on what happened in

regard to their request to transfer more generally.

    The question framed by the parties becomes whether Shefke

made that second request.  If she did so, then Beaumont "was therefore

obliged to take three steps: (1) 'identify the full range of alternative

positions for which the individual satisfies the employer's legitimate,

nondiscriminatory prerequisites'; (2) 'determine whether the employee's

own knowledge, skills, and abilities would enable her to perform the

essential functions of any of those alternative positions, with or without

reasonable accommodations'; and (3) 'consider transferring the

employee to any of these other jobs, including those that would

represent a demotion.'").  *Fisher*, 951 F.3d at 420.  However, there is no

real dispute that Beaumont's sole effort to identify positions for Shefke was Claxton generating a list of possible positions – a list that was not shared with Shefke, that Beaumont made no effort on their own to follow up on. Therefore, a jury could easily find that Beaumont did not "consider transferring" her to those roles in any meaningful sense when they did not communicate that list to Shefke, nor, apparently, follow up on her applications to those positions that they had taken the time to identify as possible fits.

On the other hand, if Shefke didn't request specific assistance identifying jobs, then her responsibility under *Burns* and Beaumont's transfer policy was to go out and apply for vacant positions; she did that, but Beaumont argues that they weren't aware of her applications. So, for the reasons explained in the following section, for that prong the question shifts to whether both parties fulfilled their obligations in the interactive process and who bears responsibility for any breakdown in that process.

ii) *Whether Shefke had a duty as a matter of law to communicate further about her applications to Beaumont*

44

Beaumont argues that the above discussion, whether "[t]he fact that Beaumont did not provide Shefke with a list of vacant positions[,] is immaterial."  ECF No. 22, PageID.729 n.1.  This is because, in their view, "nothing would have changed" about the outcome of Shefke's request for accommodation because Shefke did in fact search out vacant positions and applied for them, but (in their view) never informed anyone about these applications.  *Id.*  In Beaumont's version, the issue is that the hiring managers for those positions were apparently unaware of her accommodation request, and so their failure to hire Shefke cannot be considered an ADA violation.  In their view, Shefke's "fail[ure] to inform Fildew that she applied to other positions" bars her recovery because the responsibility for any breakdown in the interactive process should be assigned to her.  *See* ECF No. 20, PageID.648.

Of course, Beaumont is correct that the interactive process cuts both ways – "the responsibility for the interactive process is shared." *Kleiber v. Honda of Am. Mfg.*, 420 F. Supp. 2d 809, 828 (S.D. Ohio 2006), *aff'd* 485 F.3d 862 (6th Cir. 2007) (quoting citation omitted). "An employer cannot be found to have violated the ADA when responsibility for the breakdown in the informal interactive process is

45

traceable to the employee and not the employer." *Id.* Thus, if a
reasonable jury could find that Shefke is solely responsible for cutting
short a good faith dialogue between herself and Beaumont by failing to
inform them of her applications – or if no reasonable jury could disagree
that Shefke cut short a good faith dialogue – then Beaumont's liability
would (potentially) be cut off. *See, e.g.*, *Ward v. McDonald*, 762 F.3d 24,
31 (D.C. Cir. 2014) ("No reasonable jury could find that Ward's
accommodation request was denied in light of the BVA's continuing
good-faith dialogue with Ward to determine an appropriate
accommodation, which [] was cut short by Ward's sudden resignation.").

However, to the extent that Beaumont argues that Shefke alone
had the duty to specifically identify her applications to Beaumont and
any failure to do so forecloses her ADA claim as a matter of law, that is
incorrect. Certainly, Shefke had a responsibility to put Beaumont on
notice of her request for accommodation and reassignment generally,
and to have participated in moving the process along, as discussed
above. *See Burns*, 222 F.3d at 258 ("In order to establish a prima facie
case of disability discrimination under the statute, Burns must show
that he requested, and was denied, reassignment to a position for which

46

he was otherwise qualified").  But Shefke did that – she emailed Fildew in an email titled "ADA Accommodation" and asked to be considered for a specific vacant position, and then continued to apply for vacant positions, as Beaumont allegedly told her to do.

So Beaumont's argument is that Shefke specifically *also* had the responsibility in the interactive process to call or email Beaumont and let them know each time she submitted an application as an ADA request.  That is not necessarily the case.  While a plaintiff does have a burden as a matter of law to identify specific positions that were open at the time (and that the employer could have transferred them to as an accommodation), that burden arises at the *summary judgment* stage (when a plaintiff must prove their case), and does not necessarily translate to a strict requirement that a plaintiff identify them for the employer *at the time of the request for accommodation* itself (when that burden is merely part of the back-and-forth of the interactive process). *See Kleiber*, 485 F.3d at 870 (6th Cir. 2007) ("Where the requested accommodation is a job transfer, 'employers have a duty to locate suitable positions for' employees with disabilities.  Nonetheless, to overcome *summary judgment*, the plaintiff generally must identify the

47

specific job he seeks and demonstrate that he is qualified for that position") (citation omitted, emphasis added); *Fisher*, 951 F.3d at 419 (6th Cir. 2020) (quoting the above language from *Kleiber*); *Smith v. Newport Utils.*, 129 F.4th 944, 952-53 (6th Cir. 2025) (the same); *Coulson v. The Goodyear Tire & Rubber Co.*, 31 F. App'x 851, 857 (6th Cir. 2002) ("Since [the plaintiff] failed to offer proof [at summary judgment] that there were currently available positions for which he was qualified, he cannot prevail.") (citing *Smith v. Ameritech*, 129 F.3d 857, 867 (6th Cir. 1997)); *see also Jackan v. New York State Dep't of Labor*, 205 F.3d 562, 568 n.4 (2d Cir. 2000) ("The question whether an employer bears a legal duty to assist an employee in identifying appropriate vacant positions in the immediate aftermath of a request for reasonable accommodation is analytically distinct from the question of which party bears the burden of persuasion on the existence of a vacancy in litigation.  In this opinion, we hold merely that when an employee sues for failure to accommodate reasonably by transfer to a vacant position, the employee has the burden of proving that a suitable vacant position existed."); *EEOC v. OhioHealth Corp.*, No. 2:13-cv-780, 2014 U.S. Dist. LEXIS 148980, at *9 (S.D. Ohio Oct. 20, 2014)

48

("*Defendant* had a duty to locate a suitable position once Ms. Stone requested a transfer to a different position as an accommodation, and plaintiff will bear the burden of showing that a vacant position existed and that Ms. Stone was qualified for that position.") (citations omitted and emphasis added).

Defendant's citations do not alter this conclusion. In one sentence in an unpublished decision, a divided Sixth Circuit panel admittedly suggested that a plaintiff has an "evidentiary burden of pointing to a *specific vacant position* for which she *was qualified*, which she *actually requested*, and which was not provided to her." *See Steward v. New Chrysler*, 415 F. App'x 632, 643 (6th Cir. 2011) (emphasis in original). But that appears to be dicta, because as the dissenting judge pointed out, that fact was not actually at issue in the case: "Chrysler, however, does not challenge whether Steward requested to be assigned to the types of jobs that she now seeks as accommodation; rather, it argues that 'Steward has only pointed to jobs already held by other employees and that were provided to those restricted employees . . .'" *Id.* at 648 n.7 (Moore, J., dissenting). In other words, the key fact in that case was not whether the plaintiff had

actually requested specific positions at the time, it was that none of the
positions she had identified were vacant: "Chrysler . . . submitted
uncontested evidence that no such positions were available at the
relevant time." *Id.* at 643 (majority op.).[13]  And Defendant's citation to
an unpublished district court case, *Taylor v. Univ. of Mich.*, No. 17-
11473, 2019 U.S. Dist. LEXIS 231249 (E.D. Mich. Dec. 16, 2019), is
distinguishable: in that case, the plaintiff failed to proffer any evidence
that he applied for a position that he was qualified for, nor did he
identify at summary judgment "any particular position or positions for
which he was both qualified and sought." *Id.* at *21.  Here, the opposite
is true as to both propositions: Shefke did apply for positions she was
qualified for and has identified particular positions that she actually
sought at summary judgment.  Shefke did not necessarily also have to
bring her applications to Beaumont's attention when they told her that
applying was the best way to notify them of her interest.  That issue, as
explained below, is better considered a factual question of whether a
reasonable jury could find that Shefke satisfied her duty to engage in

---

[13] The court also did not find any decisions actually applying that language to
a case involving a plaintiff requesting reassignment.

50

the interactive process in good faith and Beaumont should be held
responsible for failing to follow up on her applications, or whether
Shefke should be held responsible for Beaumont's alleged lack of
knowledge of her applications for her failure to tell relevant Beaumont
staff of her request to transfer to those specific positions as an
accommodation.

> iii)   *Whether the ADA requires preference for an employee*
> *seeking a transfer as an ADA accommodation*

The parties next disagree whether the ADA actually requires
reassignment to any vacant position, or whether merely being
"considered" for those positions is enough.  In other words: once the
employee identifies a vacant position for which they are otherwise
qualified, and the employer receives their application, what duty does
the employer have?  Can they "consider" the covered employee but elect
to go with a "more qualified" candidate?  Can they do so as to each and
every one of her applications?  As the EEOC puts it: "An employer does
not meet its obligation under the ADA by merely considering an
employee's application for a job to which she's seeking reassignment.
Fair consideration of a job application does not accommodate the

51

employee.  Reassignment does." ECF No. 18, PageID.335 (citing 42 U.S.C. § 12111(9)(B) (stating that a reasonable accommodation may include "reassignment to a vacant position").  In their view, Beaumont violated the ADA by failing to place Shefke into any of several jobs for which she applied and was qualified, opting instead to follow its usual, competitive recruitment process, which lead to Beaumont selecting other candidates over Shefke.  ECF No. 21, PageID.676.  Beaumont adopts the opposite position: "the ADA permits an employer to hire the most qualified candidate, even if that results in a qualified disabled applicant who is seeking reassignment as an accommodation not getting the position."  ECF No. 20, PageID.652-53.[14]

The dispute reflects (and the parties largely cite) a circuit split on this issue.  With the EEOC are the Seventh, Tenth, and D.C. Circuit

---

[14] Beaumont also argues, before addressing the merits of the argument, that the issue is not relevant to this case because, "when Beaumont hired the most qualified candidate for the positions, it did so without any knowledge that Shefke wanted to transfer to these positions as an accommodation."  ECF No. 20, PageID.652.  However, that argument ignores that, assuming Shefke can prove that she was qualified for vacant positions to which she applied, and that Beaumont *should have* known about her applications, then the question then becomes whether Beaumont is nonetheless shielded from liability on the basis that they were not required to actually place her in any of those positions because of their alleged "best-qualified" system of hiring.  Because there are vacant positions that the court finds Shefke can prove those prerequisite points on, liability turns on this question and the issue is ripe for review.

Courts of Appeals. *See EEOC v. United Airlines, Inc.*, 693 F.3d 760, 761 (7th Cir. 2012) ("the ADA does indeed mandate that an employer appoint employees with disabilities to vacant positions for which they are qualified, provided that such accommodations would be ordinarily reasonable and would not present an undue hardship to that employer"); *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1205 (10th Cir. 2018) ("the employer has a duty to do more than merely consider without discrimination the employee's request for reassignment along with all other applications the employer may receive from other employees or job applicants for a vacant position.  Instead, in most situations, an employer must award the position to the disabled, but qualified, employee"); *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1304 (D.C. Cir. 1998) (en banc) ("the ADA's reference to reassignment would be redundant if permission to apply were all it meant"). Although not precisely on-point, the Third Circuit too has indicated that the mere opportunity to apply alongside other applicants is not sufficient to meet an employer's obligation to reassign under the ADA. *See Shapiro v. Twp. of Lakewood*, 292 F.3d 356, 357 (3d Cir. 2002) (in an opinion by then-Judge Alito, not addressing a best-qualified policy,

53

holding "because Shapiro requested accommodation and because he identified positions into which he could have been transferred -- namely, positions as a police dispatcher -- summary judgment in favor of the Township was not proper.").[15]

On the other side fall the Fourth, Fifth, Eighth, and Eleventh Circuits. *See EEOC v. Methodist Hospitals of Dallas*, 62 F.4th 938, 940 (5th Cir. 2023) ("[t]he level of preferential treatment that the EEOC asks for would compromise the hospital's interest in providing excellent and affordable care to its patients and would be unfair to the employer's other employees."); *EEOC v. St. Joseph's Hosp., Inc.*, 842 F.3d 1333, 1345 (11th Cir. 2016) (holding that the hospital employer did not have "an obligation to reassign the employee to the vacant positions for which she was qualified without competition as a matter of law.");

---

[15] *See also Ransom v. State of Ariz. Bd. of Regents*, 983 F. Supp. 895, 902-03 (D. Ariz. 1997) ("Allowing the plaintiff to compete for jobs open to the public is no accommodation at all. . . . [The employer's] policy or practice that all reassignments are made through competitive hiring prevents the reassignment of employees with disabilities to vacant positions for which they are qualified and discriminates against qualified individuals with disabilities.") (quotations and citations omitted); *Eustace v. Springfield Pub. Sch.*, 463 F. Supp. 3d 87, 106 (D. Mass. 2020) (in a thoughtful decision and the absence of First Circuit authority, joining the Seventh Circuit to hold that an employer must do more than show that they have a "disability-neutral, competitive process in place, and that a disabled employee is allowed to participate in that process, to successfully defend its position that it has provided reasonable accommodation in the form of reassignment.").

*Huber v. Wal-Mart Stores, Inc.*, 486 F.3d 480, 483 (8th Cir. 2007) ("The ADA is not an affirmative action statute and does not require an employer to reassign a qualified disabled employee to a vacant position when such a reassignment would violate a legitimate nondiscriminatory policy of the employer to hire the most qualified candidate.");[16] *Elledge v. Lowe's Home Centers, LLC*, 979 F.3d 1004, 1015 (4th Cir. 2000) (preferential reassignment to disabled employees improperly "recasts the ADA—a shield meant to guard disabled employees from unjust discrimination—into a sword that may be used to upend entirely reasonable, disability-neutral hiring policies and the equally reasonable expectations of other workers.").

The Sixth Circuit has not directly spoken on this issue, and lacking binding authority one way or the other, this court joins the

---

[16] "The Eleventh Circuit's decision in *St. Joseph's Hospital* does not address the *Barnett* Court's explanation that preferential treatment of disabled employees, despite an employer's disability-neutral rules, is sometimes necessary to effectuate the ADA. . . . The Eighth Circuit's decision in *Huber* also does not discuss *Barnett* in any depth nor how *Barnett*'s reasoning in relation to seniority systems applies to policies like best-qualified selection." *Eustace*, 463 F. Supp. 3d at 105-106 (D. Mass. 2020).

former group.[17]  The trouble with the second set of cases, although

perhaps intuitive at some level,[18] is that they ignore the statutory text

and would render "reassignment" meaningless if all it meant was that

an employer need only allow the employee to apply to vacant roles (but

never hire them).  *See Advocate Health Care Network v. Stapleton*, 581

U.S. 468, 478 (2017) (the practice of the judiciary is to "give effect, if

possible, to every clause and word of a statute."); *see generally* A. Scalia

& B. Garner, Reading Law: The Interpretation of Legal Texts 174-179

(2012); *see also Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1164 (10th

---

[17] Language from a decision in another district (and not binding on this court) joined the latter group.  *See EEOC v. Clarksville Health Sys., G.P.*, 617 F. Supp. 3d 844, 865 (M.D. Tenn. 2022) ("placement of the plaintiff in a particular job would not be a reasonable accommodation if it would require passing over candidates more qualified than the plaintiff," though still finding a dispute of fact as to whether the plaintiff may have been more qualified than the person hired).  But the Sixth Circuit has never indicated agreement with that position.  *See Bush v. Compass Grp. USA, Inc.*, 683 F. App'x 440, 450 n.4 (6th Cir. 2017) (noting that plaintiff had argued he was entitled to preference under the reasoning in *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284 (D.C. Cir. 1998), and rejecting his claim <u>not</u> because *Aka* was decided wrongly, but only because plaintiff was not qualified for the positions he sought).

[18] Though, as other courts have pointed out, the scope of the duty of reassignment has already been cabined by Congress.  *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1170 (10th Cir. 1999) (the ADA makes it such that the obligation to reassign cannot be "unduly burdensome, or even particularly disruptive, of an employer's business).  The duty does not extend to positions that are not vacant, that the applicant is not qualified for, or if it is not a reasonable accommodation or represents an undue hardship.  *Id.*  And "the employer has the authority to pick and choose which appropriate vacant job is to be offered to the otherwise qualified disabled employee."  *Id.*

Cir. 1999) ("We reject this narrow definition of reassignment, both because it does violence to the literal meaning of the word reassignment and because it would render the reassignment language in 42 U.S.C. § 12111(9) a nullity.").

Start with the text. *Thompson v. United States*, 145 S. Ct. 821, 826 (2025). The ADA requires employers to "mak[e] reasonable accommodations," 42 U.S.C. § 12112(b)(5)(A), and "reasonable accommodation" is defined that it "may include" "reassignment to a vacant position" (among other possible accommodations). § 12111(9). Because "reasonable accommodation" definitionally contemplates the possibility that a disabled person will need "reassignment to a vacant position," that necessarily includes the very occasional "preference" that Defendant does not agree with.

Consider a company that has an employee whose disability renders them completely unable to perform their current role *even with* a reasonable accommodation, but who *could* perform the duties of a presently-vacant role with or without a reasonable accommodation. The obvious solution under the statute is reassignment to that vacant role – because, in that scenario, the ADA's other reasonable accommodations,

57

including "job restructuring, part-time or modified work schedules" and "acquisition or modification of equipment or devices" are not sufficient to allow that employee to perform in their current role absent an undue burden on the employer. *See* 42 U.S.C. § 12111(9)(B) (listing other examples of possible reasonable accommodations).

That situation is, in the light most favorable to Shefke, precisely what happened here: she was unable to perform her job as a Unit Shift Lead anymore, even with her existing, approved reasonable accommodation, and Beaumont had already reasonably denied her a further reduction in hours citing an undue burden on their staffing needs. In Shefke's current role, there were no more reasonable accommodations left – she was forced to instead use her FMLA leave intermittently and unexpectedly, calling in one to two days per week. Her choices, such as they were, were to transfer internally to another position with fewer hours (thereby accommodating her disability), continue doing a job that she was not physically able to do (and face possible repercussions for unexcused absences), or resign. But if the employer in effect refuses to transfer her (by, for example, ignoring her transfer requests or continually hiring other candidates for every

58

vacancy that comes up), that is no choice at all.  *See Fisher*, 951 F.3d at 417 ("an employer 'may not illegitimately deny an employee a reasonable accommodation' pursuant to 'a general policy and use that same policy as a' so-called 'neutral basis for firing him.'") (citing *EEOC v. Dolgencorp, LLC*, 899 F.3d 428, 435 (6th Cir. 2018)).

It is true that, when there is an employee for whom reassignment to a vacant position is the only option remaining, that employee's application for transfer will necessarily conflict with the interests of other applicants for that same role.  But under the text of the ADA, that conflict is irrelevant unless there is some preexisting, pre-vested right of other employees at issue.  *See Burns*, 222 F.3d at 257 ("Employers are not required to . . . displace existing employees from their positions, or violate other employees' rights under a collective bargaining agreement or other non-discriminatory policy . . ."); *US Airways, Inc. v. Barnett,* 535 U.S. 391, 402-03 (2002) (holding that in the run of cases reassignment is a reasonable accommodation, but is generally unreasonable if the reassignment would violate "the rules of a seniority system").  This (generally) mandatory "preference," such as it is, is nonetheless reasonable in the run of cases because it generally *applies*

*when reassignment is the only remaining option* for a disabled employee:

"Reassignment is the reasonable accommodation of last resort and is

required only after it has been determined that: (1) there are no

effective accommodations that will enable the employee to perform the

essential functions of his/her current position, or (2) all other reasonable

accommodations would impose an undue hardship."  EEOC

Enforcement Guidance, *supra* Section IV.C.i; *see Reno v. Koray*, 515

U.S. 50, 61 (1995) ("some deference" owed to interpretative rules and

internal agency guidelines adopted by an agency charged with

administering a statute); *Cassidy v. Detroit Edison Co.*, 138 F.3d 629,

634 (6th Cir. 1998) ("Generally, transfer or reassignment of an

employee is only considered when accommodation within the

individual's current position would pose an undue hardship").

In *US Airways, Inc. v. Barnett*, 535 U.S. 391 (2002), the Supreme

Court rejected the anti-preference interpretation of the ADA because

the argument "fails to recognize what the Act specifies, namely, that

preferences will sometimes prove necessary to achieve the Act's basic

equal opportunity goal." *Id.* at 397.[19]  If that were not the case, then the
protection of the ADA would be a paper shield; an employer could, for
example, tell an employee to apply to transfer to vacant positions, and
in each decide to go with another candidate – thus claiming that
reassignment was an option in theory, but denying it in practice.
Beaumont could not credibly claim compliance with the ADA if Shefke
was subsequently rejected from each and every one of the positions she
applied for reassignment to.  *Smith*, 180 F.3d at 1164 ("'reassignment'
must mean something more than the mere opportunity to apply for a
job with the rest of the world").  Just as neutral "office assignment"
rules might be required to occasionally yield to the covered employee
who requires a ground floor office, so too must generally neutral hiring
considerations occasionally yield to a covered employee left with no

---

[19] "Were that not so, the 'reasonable accommodation' provision could not
accomplish its intended objective.  Neutral office assignment rules would
automatically prevent the accommodation of an employee whose disability-imposed
limitations require him to work on the ground floor.  Neutral 'break-from-work'
rules would automatically prevent the accommodation of an individual who needs
additional breaks from work, perhaps to permit medical visits.  Neutral furniture
budget rules would automatically prevent the accommodation of an individual who
needs a different kind of chair or desk."  *Barnett*, 535 U.S. at 397-98.

options but to transfer into a vacant position that accommodates their
needs. *See Barnett*, 535 U.S. at 397-98.[20]

The role of this court is not to decide as a matter of policy whether
providing preferential treatment in reassignment to vacant positions is
unfair to other applicants in the narrow band of cases where
reassignment has become the only available option available for a
current employee; that choice is written into the statute. *See Burns*,
222 F.3d at 256 ("If an employee, because of his disability, can no longer
perform the essential functions of the job that he or she has held, a
transfer to another vacant job for which the person is qualified may
prevent the employee from being out of work and employer from losing
a valuable worker.") (citation omitted); *Bratten v. SSI Servs., Inc.*, 185
F.3d 625, 633 (6th Cir. 1999) (rejecting the premise that "if an employee

---

[20] As far as Beaumont seems to argue that the statutory text should yield to
its interests as a healthcare provider, that argument does not hold water. *See* ECF
No. 17, PageID.102-03 (arguing the EEOC's position "would compromise the
hospital's interest in providing excellent and affordable care to its patients and
would be unfair to the employer's other employees") (quoting *EEOC v. Methodist
Hospitals of Dallas*, 62 F.4th 938, 940 (5th Cir. 2023). The ADA carves out defenses
available to an employer, *see* 42 U.S.C. § 12113 (defenses for business necessity and
religious entities), but Congress did not reserve special status for the healthcare
industry. And no one disputes that Beaumont is free to set their required
qualifications for its positions however it likes; once it has set that bar, however, its
general hiring system will occasionally have to preference to the qualified internal
applicant who has no other options.

cannot be reasonably accommodated in his current position, then the employer is under no obligation under the ADA to re-assign that employee to another position in the company" as "contrary to congressional direction"). While on its face, the opportunity to apply on equal terms with other candidates may look non-discriminatory, it is not a *reasonable accommodation* for the covered employee by the ADA's terms. ECF No. 21, PageID.673.

It is worth pointing out that, although Beaumont's argument assumes at some level that reassigning Shefke would preempt their "most-qualified" hire system as to *each* vacant position they had (and hints that this is an unreasonable requirement), that is not actually the case.[21] Beaumont was not required to assign her to each and every one of the positions she applied for, they just had to pick one (and they were free to choose whomever they liked for the others). *See Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1170 (10th Cir. 1999) ("the

---

[21] And of course, the fact that the CN opening "was awarded to a displaced internal RN," ECF No. 17-15, PageID.166, suggests that the "most qualified" hiring policy was already subject to exceptions, so an ADA exception is only one exception among several.

employer has the authority to pick and choose which appropriate vacant job is to be offered to the otherwise qualified disabled employee.").[22]

Thus for those positions that Shefke is able to prove were vacant, that she was qualified for, applied to, and is not responsible for a breakdown in the interactive process, the only remaining genuine issue of fact that could arise is if Beaumont shows the applicant who was hired had a preexisting, vested interest in the role – something which as a matter of course, external applicants who did not already work for Beaumont will not be able to show, but internal applicants may be able to prove. *See Burns*, 222 F.3d at 257 ("nothing in the ADA requires an employer to abandon its legitimate, nondiscriminatory company policies defining . . . entitlements to intra-company transfers."); *id.* ("We do not, however, hold that the employer must . . . displace other employees' rights to be considered in order to accommodate the disabled individual."). Viewing the facts in the light most favorable to Plaintiff, Beaumont's alleged "most qualified" hire system for transfer applications resulted multiple times in the hiring of another external

---

[22] So, for example, assuming the CCB position had a candidate the hiring manager particularly liked, Beaumont could have placed Shefke in the QIRN position and gone with their preferred candidate for the other, or vice versa.

candidate over Shefke, an internal qualified transferee who requested

the transfer as an accommodation.  Assuming Shefke can prove the

remaining elements of her claim, that result would violate the ADA.

iv)    *Shefke's eventual transfer is not relevant to liability*

Both parties agree that Shefke eventually found a new position on

her own, a part-time nursing position at Beaumont's Infusion Clinic.

Beaumont thus argues that "her request to transfer to a part-time

nursing position at Beaumont's Hospital was granted."  ECF No. 20,

PageID.648.

However, since Beaumont concedes that Shefke obtained this

position on her own, *see* ECF No. 20, PageID.647, that application is not

relevant to their liability in this case.  The court disregards Beaumont's

argument that they in some way "approved" her request to transfer

when "Shefke found a position to transfer to, outside of the interactive

process."  *See* ECF No. 17, PageID.97.  Shefke's eventual reassignment

without Beaumont's help, months after they did not hire her for

positions she applied to and was qualified for, does not speak to

whether Beaumont fulfilled its duties under the ADA as to the positions

Shefke has identified as at issue.  *See Heinz v. Progressive Cas. Ins. Co.,*

65

No. 1:04 CV 1604, 2006 U.S. Dist. LEXIS 112612, at *22 (N.D. Ohio

Apr. 12, 2006) ("The word 'assign' means more than allowing the

employee to apply for a job on the same basis as anyone else.  It implies

some active effort on the part of the employer.  If an employee applies

for and obtains a job elsewhere in the enterprise on the employee's own

initiative, it would not be described as having been reassigned.") (citing

*Aka v. Washington Hospital Center*, 156 F.3d 1284 (D.C. Cir. 1998)).

> v)      *Whether Beaumont satisfied its duty under the ADA for*
>
>         *each position at issue*

With these legal conclusions in mind, the court now addresses the

specific applications at issue.  The parties dispute Beaumont's duties as

to five positions, though Plaintiff only alleges liability on four of them.

*See supra* Table 1.  The court walks through each position separately for

clarity.

> a.      Care Coordinator (CCA)

As to the CCA role, the first Shefke applied to, there is no question

that Shefke identified the role and communicated that to Beaumont,

that she was otherwise qualified for the position, and that Beaumont

did not consider her for the position.  *See Fisher*, 951 F.3d at 419.  (This

role is the one that Shefke first reached out to Fildew to inform her that she had applied, and that Fildew passed on to Lockwood and Claxton. *See* ECF No. 17-9, PageID.139-140.)  Thus unlike the discussion in the subsequent CCB, QIRN, and CN positions, there is no question that Beaumont was fully aware of her request for accommodation.[23] Beaumont also raises no argument that the internal candidate they hired for the position had any sort of preexisting right to the position

---

[23] As to this position specifically, Beaumont's arguments about Claxton's lack of knowledge of Shefke's ADA accommodation request are beside the point (the court addresses those arguments more fully below as to those positions that Beaumont alleges Shefke never communicated about to *anyone* with hiring authority).  *See, e.g.*, ECF No. 20, PageID.652 ("of the positions Shefke interviewed for, no one at Beaumont knew that she was seeking these positions as an accommodation").  As to Shefke's CCA application, however, Fildew unquestionably understood that Shefke was requesting a transfer to that role as an accommodation for her disability; her knowledge is imputed to Beaumont, and whether Fildew successfully communicated that to Claxton, or whether Claxton understood the request for accommodation, are irrelevant.  *See* ECF No. 18, PageID.316; ECF No. 20, PageID.633 (Fildew was the human resources manager for the hospital and reported directly to the President of Beaumont's Wayne hospital); *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999) (the employee must provide "the employer with enough information that, under the circumstances, the employer can fairly be said to know of both the disability and desire for accommodation."); *see also, e.g.*, *Riva v. GEICO Ins. Agency, Inc.*, No. 2:20-CV-2170, 2023 U.S. Dist. LEXIS 166262, at *7 (D. Nev. Sep. 18, 2023) (a supervisor's knowledge of a plaintiff's disability and request for accommodation are imputed to the employer).  To make Claxton's knowledge dispositive of Shefke's claim would potentially allow Beaumont to avoid liability simply by having Fildew sit on Shefke's accommodation request, a conclusion that refutes itself.  *See EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 808 (7th Cir. 2005) ("[An employer] cannot avoid liability by contending that [the employee] should have tried harder to force it out of its reluctant posture").

(other than the timing of their application).[24]  There is no dispute, then, that hiring Shefke would not have "violate[d] other employees' rights[.]" *See Burns*, 222 F.3d at 257.

Further, the court notes that, whatever the relevance of Shefke's application to the POHA/PACU position in June 2019 (and Shefke's withdrawal from consideration of that role), and whatever the relevance of Shefke's later alleged failure to communicate with Beaumont when applying to other part-time positions, none of those facts are relevant to the CCA position because all of those events came later.  In other words, any later alleged breakdown in the interactive process that might be attributable to Shefke simply does not apply to this position.[25]  Shefke clearly articulated a request to transfer to a specific role for which she

---

[24] Even if it were true that "another employee within the department,who had already been performing some of the job duties[, ] was offered the position as a promotion," ECF No. 17-15, PageID.165, that does not mean that employee had a vested right to the position.

[25] Without expressing an opinion on the subject (because the court lacks the benefit of briefing on the issue), the court notes that issue may be at least partly relevant to determining Shefke's *damages*, but it is not relevant to whether Beaumont's undisputed failure to even consider her for that position violated the ADA.  *See, e.g.*, *Aston v. Tapco Int'l Corp.*, 631 F. App'x 292, 298 (6th Cir. 2015) (employers may toll compensatory relief by offering an ADA claimant the job they sought).

was qualified, but Beaumont undisputedly did not consider her for the position.

Thus, the <u>only</u> factual dispute between the parties as to Shefke's CCA application is whether the position was, in fact, "vacant," or whether the vacancy had closed – and therefore Shefke's interest in it is irrelevant to establishing Beaumont's liability. *See* 42 U.S.C § 12111(9)(B) (the ADA only proposes "reassignment to a *vacant* position" as a reasonable accommodation) (emphasis added); *Burns*, 222 F.3d at 257 ("an employer need only reassign a disabled employee to a vacant position. Employers are not required to create new jobs, [or] displace existing employees from their positions, . . .") (citations omitted). Beaumont argues the position, although listed, was already filled; the hiring manager allegedly had "two people that she [was] considering," and Claxton testified that meant the role was closed. ECF No. 17-8, PageID.134 (Claxton email) ("The position (Care Coordinator-30111350) that she has applied to; the manager has two people that she is considering."); ECF No. 17-19, PageID.255 (Claxton Dep.) ("[I]f you look at the statement, "The position," the care coordinator position in parentheses, "that she's applied to, the manager has two people that

they're considering," based on that statement, the position, for all intents and purposes, is closed and so I would – it would be safe to assume that we had provided her additional positions to review because that particular role is closed."). Beaumont insists that, in the absence of rebuttal testimony, this is sufficient to grant them summary judgment. ECF No. 22, PageID.723.

The EEOC, on the other hand, doesn't dispute that there may have been two other candidates in mind, but argues that definitionally, the position was not "closed," because it had not been filled when no one had been hired. *See* ECF No. 23, PageID.732 (citing Merriam-Webster's dictionary definition of "filled"). So, says the EEOC, "[s]ince it is undisputed the position was *not* filled, no permissible inference can be drawn in Beaumont's favor." ECF No. 23, PageID.732.

The court disagrees that either position is conclusive, and therefore finds that neither party entitled to summary judgment on this point. Without more facts, the court cannot say that it would be unreasonable for a jury to find, as Defendant argues, that the time for interviews and new applications had closed on a position, even if it was technically still listed on an electronic portal as unfilled. It is possible

70

to envision a set of facts in which the hiring process was so far along, and the hiring decision so imminent, that the vacancy was for all intents and purposes closed.  Or another way to think about it: in that situation, requiring full consideration of an eleventh-hour candidate is not a reasonable accommodation (even if reassignment is generally reasonable in the run of cases) because it imposes an undue burden on that particular hiring process.  For example, if it really were the case that "the hiring manager had already extended an offer to another candidate," that would probably effectively mean the position had closed, even to Shefke's transfer request.  *See* ECF No. 17, PageID.89; ECF No. 17-15, PageID.165 (indicating that was the case).  But the actual evidence supporting Defendant's contention that an offer was out to another candidate is weak, and a reasonable jury could ignore it. *Compare* ECF No. 17-18, PageID.233 (Fildew, who was *not* the recruiter for that position, stating "I believe I already had a job offer or candidate already in process that was already out there pending."), *with* ECF No. 17-19, PageID.255-56 (Claxton, who *was* the recruiter for that position, stating only that the manager had two candidates that they were considering, stating "it would be safe to assume that . . . that particular

71

role is closed," and saying nothing about an offer being out).[26]  On

Claxton's testimony, and in the light most favorable to Shefke, it is also

possible that, even though the hiring manager already had "two people

that she was considering," what that meant in reality was only that the

hiring process was at the "collecting resumes" stage of the process, and

that the hiring manager had simply selected two likely-looking resumes

from the pile to interview.  In that circumstance (or materially similar

scenarios), a reasonable jury could easily find the position to still be

"vacant."[27]  Or, to frame the scenario in "reasonable accommodation"

terms again: it is not unreasonable nor unduly burdensome in that

situation to simply ask the hiring manager to consider a third

candidate.  Whether the facts ultimately hew closer to one extreme or

---

[26] Beaumont's answer to Plaintiff's interrogatories has a third version: "another employee within the department, who had already been performing some of the job duties and was offered the position as a promotion.  The hiring manager had already decided to extend an offer to the selectee before Beaumont learned Shefke was interested in the position."  ECF No. 17-15, PageID.165.  But the court can only consider evidence that would be "admissible at trial."  *Lemon v. Norfolk S. Ry.*, 958 F.3d 417, 420 (6th Cir. 2020) (citing Fed. R. Civ. P. 56(e)(4)).  No basis is given for that statement other than that counsel gathered this information "from various sources and corporate records," and so the court cannot conclude that it would be admissible at trial.  ECF No. 17-15, PageID.167.

[27] The EEOC did not, as defense counsel argued, need to produce testimony on this point; a jury could reasonably reach this result on the inconclusive evidence available.

the other, the issue is a question of fact for a jury to decide, in full

consideration of just how close to hiring someone the manager was, and

just how thorough any culling of candidates prior to Shefke's

communication had been.  On the limited facts provided to the court at

this stage, a reasonable jury could certainly conclude that the position

was "vacant" and available when the hiring manager had not yet filled

it – but so too could they say that the position was filled if the hiring

manager had effectively concluded the process but had simply not

updated the jobs portal.  That is not merely a semantic issue – the issue

is, as the court has explained, more fundamentally whether Beaumont

could have, but failed to, put forth reasonable efforts to consider her for

that position, or whether their failure to do so was reasonable under the

circumstances.

The motions for summary judgment as to this position are

therefore both denied on this limited issue.  However, to narrow the

issues, Plaintiff's motion for summary judgment as to liability on the

CCA application is granted in part as to the issues of law and fact that

the court has identified, and Defendant's motion is denied.  Specifically:

Shefke was disabled, otherwise qualified for the position, and assuming

the position was vacant, Beaumont did not meet its duty under the ADA to reasonably accommodate her by reassigning her to this or another vacant position for which she was qualified.

### b.   Quality Improvement RN (QIRN)

After Shefke was told the care coordinator (CCA) position wouldn't work out, Shefke applied for two more positions on April 16, 2019, the same day she spoke with Claxton by phone and emailed with Fildew. One was the QIRN position, which appeared on Claxton's list of potential matches for Shefke.  ECF No. 17-8, PageID.134.  Shefke interviewed but was not hired for the position.  ECF No. 17-14, PageID.158.  Beaumont alleges that the most qualified candidate was selected for the position.  ECF No. 20, PageID.646.  That external candidate started work on May 16, 2019.  ECF No. 17-15, PageID.164. Thus there is no genuine dispute that she applied and interviewed, but Beaumont did not place her in this position.[28]  Further, for the same

---

[28] Although that fact alone is sufficient for liability purposes, the court also points out that at times, Beaumont cast its interview process for ADA transfers like Shefke as just a "meet and greet" and a mere formality to ensure Shefke could do the job with or without reasonable accommodation.  Quite arguably, their hiring of other people, including external applicants, over Shefke – not just for one role, but several roles that she interviewed for – belies that testimony.

74

reasons articulated above, Shefke's application for the POHA/PACU
position in June is irrelevant to determining Beaumont's liability as to
this open position.

In some ways, the QIRN opening is the most straightforward of
the three jobs Shefke applied for after the CCA position that are at
issue.  Beaumont allegedly hired a candidate with the "requisite"
experience for the CCB position, placing Shefke's qualifications in issue
for that role.  Beaumont hired a "displaced" internal RN for the CN
position,[29] and that position also came after Shefke withdrew from
consideration for the POHA/PACU position and after Fildew
communicated the need for Shefke to tell her specifically what she had
applied for, placing in issue Shefke's duty to update Beaumont on her
applications in light of a specific notice from Fildew as well as Shefke's
withdrawal from the interactive process.  For the QIRN position,
however, none of those concerns apply, and the application squarely
presents the principal disputes between the parties: whether Beaumont
was on notice of her application, whether Shefke should have told

---

[29] Compare as to the QIRN and CCB positions, where Beaumont hired an
external candidate.

Beaumont about her application, and whether Beaumont should have assisted her with identifying open positions. *See supra* Sections IV.C.i-iii.

*First*, the court considers Shefke's request for "reassignment to a position for which she was otherwise qualified." *See Fisher*, 951 F.3d at 419. The court finds that whether Beaumont bears responsibility for a breakdown in the interactive process by failing to follow up on Shefke's application, or whether the blame lies with Shefke for failing to tell Beaumont about her application (and therefore Beaumont is not liable for failing to do more than interview her because the hiring manager was not aware she was applying as an accommodation), are questions of fact for a jury.

On one hand, a reasonable jury could find that Shefke did all she needed to. They could find that Beaumont was constructively on notice of her application to the QIRN position, even if they accept that Beaumont lacked actual notice. A jury could find that Claxton, who had identified the QIRN position as a possible match for Shefke, should have known that Shefke had applied to the position when they told her to apply to open positions and she did so that very same day. As the

EEOC frames it: "[c]ontext is crucial here: Shefke applied for the second

Care Coordinator and Quality Improvement RN openings on the same

day as the last email between Claxton and Fildew regarding Shefke's

'ADA Accommodation' request."  ECF No. 23, PageID.734 (citing ECF

No. 18-20 at PageID.622-623 (date of applications), No. 18-11 at

PageID.434 (emails)).  A jury could find it relevant to Fildew's

knowledge that "HR was responsible for screening nursing applications

for minimum qualifications, scheduling the candidates for interviews,

and discussing those candidates with hiring managers."  ECF No. 21,

PageID.674-75 (citing ECF No. 18-7, PageID.395-396; 406 (HR Policy

and Procedure).  And on the Talent Acquisition side, Claxton is alleged

to have "handled the recruiting for Care Coordinator [A and B] and

Quality Improvement RN, as he testified that he was responsible for

recruitment for all 'non-bedside' positions in 2019."  ECF No. 23,

PageID.733-34 (citing ECF No. 17-19 at PageID.250, 258 (Claxton Dep.

at 9:18-10:4, 38:16-40:8)).  He also testified that when internal

candidates apply, they're screened by Talent Acquisition (presumably

Claxton), and if they meet the qualifications required, they are sent on

to the hiring manager.  ECF No. 17-19, PageID.252 (Claxton Dep. at

15:2-5).  Claxton seems to have been fielding applications for the QIRN

position, *see* ECF No. 18-19, PageID. 482, 491 (communications to

Claxton about QIRN applicants), and the evidence shows that Claxton

had in his possession messages that, a jury could easily find, should

have put him on notice of Shefke's application.  ECF No. 18-19,

PageID.492 (Shefke's application to QIRN, and internal notations

referencing messages that appear to go to Claxton about it).  Thus, a

jury could find that Claxton and "Beaumont either knew or should have

known that Shefke applied for the vacancies in question while her

request for reassignment was pending."  ECF No. 21, PageID.675.

A jury could also consider Shefke's testimony that "during

meetings and on phone calls, I made everyone aware I'm applying for

jobs and interviewing and I'm not getting anywhere."  ECF No. 17-17,

PageID.206 (Shefke Dep. at 125); *see also id.* at PageID.211 ("in all

these back-and-forths, *I definitely let them know that I was applying* for

and not getting anywhere with my -- with my interviews.") (emphasis

added).  Beyond any phone calls that may have happened, Shefke also

followed up that day with an email renewing her request to be placed in

an open position: "I am officially asking Beaumont to place me into an

open position that I am qualified for.  This is a fair expectation under the ADA."  ECF No. 18-11, PageID.431.  She followed up again three days later to indicate she and Fildew had spoken by phone: "You have indicated that my only remedy is to apply for jobs within the organization and go through the interview process.  This process can take many months, meanwhile I am forced to remain in a position that I cannot fulfill the requirements for."  ECF No. 18-11, PageID.431.  A jury could reasonably find that these calls and statements put Fildew or Claxton on notice that Shefke had done as they asked and had pending applications they needed to look into, even if she did not quite say so directly.

Further, a reasonable jury could find that Claxton also knew or should have known that Shefke's request for transfer, and her applications to jobs that he oversaw the recruitment for, were specifically ADA accommodation requests; the email chain discussing her placement was titled, after all, "ADA accommodation."  ECF No. 18-12, PageID.434-36.  Fildew's original email to Amanda Lockwood, presumably included in the cc'ed Claxton, represented that Shefke was "no longer able to continue fulltime" in her current role.  ECF No. 18-12,

79

PageID.436.  *See Fisher*, 951 F.3d at 419 (quoting *Smith v. Henderson*, 376 F.3d 529, 535 (6th Cir. 2004)) ("The employee is not required to use magic words such as 'accommodation' and 'disability'; rather, we ask whether 'a factfinder could infer that [the interaction] constituted a request for an accommodation.'").  Thus a jury could find that Claxton knew or should have known both that she had applied to the QIRN position, and that her application was an ADA accommodation request.  And a reasonable jury could also note that, having been put on notice of her accommodation request, Claxton could have, but chose not to, add her to the interview schedule for the QIRN position, *see* ECF No. 18-12, PageID.434 (emails between Claxton and Fildew), and count that as a strike against Beaumont's "good faith" participation in the interactive process.  Talent Acquisition often referred suitable candidates to hiring managers, but did not here.  *See* ECF No. 17-19, PageID.257 (Claxton Dep. at 36:9-37:13).  Or, for that matter, either Claxton or Fildew could have forwarded Claxton's list to Shefke, but did not do so, and a jury could count that against Beaumont as well.  *See* ECF No. 17-18, PageID.234.

80

Thus a reasonable jury could find that Beaumont bears the lion's share of responsibility for any breakdown in the interactive process, because in the light most favorable to Shefke, Beaumont identified a process for Shefke to follow, and then didn't follow that process themselves. *Kleiber*, 485 F.3d at 871 (If the interactive process was triggered but not successfully resolved, "courts should attempt to isolate the cause of the breakdown and then assign responsibility.").  As pointed out above, *see supra* Section IV.C.i, an employer can, under *Burns*, put the burden on an employee to identify vacant positions through the interactive process, as long as that requirement is generally applicable, nondiscriminatory, and applied to the employee in good faith.  Thus, an employee's *failure* to abide by an employer's policy requiring an employee to apply for a transfer bars recovery: "[a]llowing Burns to recover despite his failure to abide by KCC's non-discriminatory policy requiring him to apply for a transfer to a new position within his restrictions" would not be consistent with the ADA. *Burns*, 222 F.3d at 258.  But "unlike the employee in *Burns*, Shefke *did* abide by the only process" that Beaumont said was available to pursue a job transfer – the recruitment process.  ECF No. 21, PageID.677.  In

81

the light most favorable to Shefke, she did all that Beaumont told her

was required: she identified open, vacant positions for which she was

otherwise qualified, and applied to them.  Again, Claxton's instruction,

relayed to Shefke by Fildew over phone, was that "she needs to let us

know which she would be interested in and *the best way to do this is by*

*applying*."  ECF No. 18-12, PageID.434 (emphasis added); ECF No. 18-

11, PageID.431 ("You have indicated that my only remedy is to apply for

jobs within the organization and go through the interview process.").

These statements can be fairly read to indicate that she didn't need to

tell Beaumont anything else at all.  The fact that she unquestionably

applied to vacant positions for which she was qualified puts Shefke in a

far different position than in cases where the Sixth Circuit has found a

plaintiff's effort wanting.  *See Burns*, 222 F.3d at 250 (Burns "became

aware of several vacant positions at KCC. He did not, however, apply

for any of the positions"); *Cassidy v. Detroit Edison Co.*, 138 F.3d 629,

633-34 (6th Cir. 1998) (affirming judgment for the defendant because,

in proposing "only general and vague accommodations, such as a

transfer to a position in an allergen-free environment," the plaintiff did

not satisfy her burden of proving that there was a position within the

company for which she was qualified and to which reassignment would have been a reasonable accommodation); *Conklin v. City of Englewood*, 1996 U.S. App. LEXIS 26173, 1996 WL 560370 (6th Cir. Oct. 1, 1996) (noting, in affirming judgment for the defendant, that the job that the plaintiff initially requested did not exist within the company and that the plaintiff "never applied" for the other position to which he argued he should have been transferred).  It would be somewhat odd – again, in the light most favorable to Shefke – if a plaintiff who apparently followed every instruction she was given by her employer to initiate the reassignment-as-accommodation process could not recover as a matter of law because the employer in fact needed her to do more (via uncommunicated requirements).  If an employer puts the onus on the employee to apply to vacant positions, *Burns*, 222 F.3d at 258, a jury could easily find that the responsibility to follow up on any applications that employee submits is with the employer.  In the court's view, a genuine dispute of material fact exists on this point.  A reasonable jury could find that alleged rug-pull unreasonable and that breakdown of the interactive process attributable to Beaumont; on the facts presented, they could find that Beaumont bears the fault for their failure to even

83

check if Shefke had open applications in the days following the conversations in which they told her to apply to vacancies, and for apparently failing to understand that those applications were requests to transfer as an accommodation.

However, the issue is not quite so one-sided to award summary judgment to the EEOC.  It remains a problem point for Shefke's case that she arguably did not put anyone at Beaumont on notice (specifically, Fildew or Claxton) that she had applied to the QIRN or CCB positions as a request for accommodation.  Had she simply done so, this case would be much more straightforward; Beaumont's failure to place her in either role, when plainly on notice of her request for a transfer to that role as an accommodation, would violate the ADA.  In the light most favorable to Beaumont, however, her failure to communicate about her applications may represent a failure to reasonably engage in the interactive process.  For example, Beaumont (arguably) met any obligations it needed to in the interactive process – they identified open positions and told her, in so many words, "we have open positions that we think you might be qualified for, so go on the jobs portal and apply for the ones you're interested in." *Cf. Smith v.*

84

*Newport Utils.*, 129 F.4th 944, 953 (6th Cir. 2025) ("Frisbee did, in fact,

investigate whether Smith qualified for any unfilled jobs. . . . Frisbee

identified four open positions: two lineman positions, a wastewater-

maintenance position, and a customer-service position," but the plaintiff

wasn't qualified for any). In fairness to Beaumont, a jury could find

that Beaumont's instructions to apply for open positions fairly represent

the opening stages of a reasonable interactive process, not the end-all-

be-all; Shefke's duty was to then a) apply to the positions *and* (albeit

implicitly) b) tell Fildew that she'd done so. Although Fildew or Claxton

could have shared the list of possible positions with Shefke, their list

was not necessarily definitive because they did not actually know with

certainty whether those positions would meet Shefke's needs. *See* ECF

No. 18-12, PageID.434 (Claxton email) (noting that Shefke's

applications would be helpful to him because she could identify which

Beaumont locations she was willing to consider: "For example; I would

not want to send her to the Transfer Ctr if she is not interested in

working in Southfield. Likewise with GP or Royal Oak."); *Mengine v.*

*Runyon*, 114 F.3d 415, 420 (3d Cir. 1997) ("a disabled employee seeking

reassignment will be best served by employer and employee working

85

together to identify suitable positions."). As to Shefke's communications with Fildew, although Shefke testified that she told Beaumont that she was getting nowhere with her applications, *e.g.* ECF No. 17-17, PageID.206 (Shefke Dep. at 125), she also couldn't specify when that conversation was and as to what position – and no email appears to exist verifying that. ECF No. 18-2, PageID.358 (Shefke Dep. at 141) (". . . I can't tell you if I specifically told her."). Thus a jury could discount Shefke's testimony that she put Fildew and Claxton on notice of her applications on phone calls, and they could note that her emails arguably never clearly said "I've got an active application out right now that I need your help with." And for all the evidence that Claxton was in charge of recruiting for these positions and should have been aware of Shefke's applications, *see* ECF No. 23, PageID.734, ECF No. 18-19, PageID.492, nowhere did Claxton testify to having actual knowledge of Shefke's applications. *See, e.g.*, ECF No. 17-19, PageID.256 (Claxton Dep.). As far as the evidence provided on the QIRN application tends to show that Claxton knew or should have known about Shefke's application to this position specifically, ECF No. 18-19, PageID.492, a jury could still find that Claxton had never been put on notice that

Shefke was seeking that position *as an accommodation*.  *See* ECF No. 17-19, PageID.253 (Claxton Dep. at 19-20) (not recalling receiving any ADA request for accommodation from Fildew at any time); *id.* at PageID.254 (Claxton Dep. at 22) (testifying that he also never saw the original content of Shefke's email to Fildew, only the subject line).[30] Thus while a jury could find in Shefke's favor, a jury could also conclude that, even under Beaumont's instructions, Shefke was reasonably expected to communicate about her applications with Beaumont in order to put them on notice of her request for accommodation as to *this position*, and that her failure to do so represents a breakdown in the interactive process attributable to Shefke.

---

[30] Contrast with the CCA position above, where Fildew unquestionably knew *both* that Shefke had applied *and* that she was requesting transfer as an ADA accommodation, and her knowledge of that request is imputed to Beaumont.  Here, even assuming that Claxton knew or should have known about her application, it is not beyond reasonable dispute that Claxton knew or should have known that her application to that position was a request *for accommodation*.  Thus he did not necessarily have all the relevant information to impute liability to Beaumont.  On Fildew's end, there is a reasonable dispute as to whether Fildew should have known about Shefke's application to the QIRN position, so even accepting that she at all times was aware that Shefke sought an ADA accommodation, her knowledge may also have been limited and does not necessarily impute responsibility to Beaumont. As far as the EEOC's position might seem to argue that Fildew and Claxton's *combined* knowledge can be imputed to Beaumont, that is better thought of as a question of fact of whether they made reasonable efforts in the interactive process.

*Second*, the court considers the second prong, whether Shefke requested "specific assistance in identifying jobs for which she could qualify." *Fisher*, 951 F.3d at 419.  Independent of the discussion above and the rest of the interactive process, a factfinder could *also* reasonably disagree about whether Shefke requested specific assistance in identifying vacant jobs.[31]  *See Fisher*, 951 F.3d at 420.  She alleges that she made several requests that could fit the bill.  *E.g.*, ECF No. 18-2, PageID.364 (Shefke Dep. at 100) ("Q: Did you provide Kelley [Fildew] with any details about what type of open position that you were looking for at that point in time?  A: Only what I indicated in the e-mail, that I would like to fulfill my duties as a nurse and be placed in a job that I would be successful at. . . . And during meetings, phone calls, I was asking for a job that was not physical but that was a nursing role."); ECF No. 18-11, PageID.431 ("I am asking not for a promotion, but at the very least a lateral move to a position in which I can meet the requirements.").  And a jury could also find that Fildew in fact did understand her request as such.  *See* ECF No. 18-12, PageID.436

---

[31] Again, there is no evidence proving that either Claxton or Fildew actually shared the list of possible positions that Claxton generated with Shefke.  ECF No. 20, PageID.638.

("Megan is a FT Nurse here at Wayne and looking to go PT as soon as possible as she is no longer able to continue fulltime.  If she could be scheduled for interviews *for anything she meets the qualifications for* that would be helpful.") (emphasis added).  However, while a factfinder could find that Shefke requested assistance in finding available jobs (even if she didn't use the "magic words"), they could also conclude that most of the emails and communication seem to revolve more around the fact that Shefke was fully capable of identifying jobs on her own (and didn't need or request assistance doing that), and that what she wanted Beaumont's help with was being placed in the jobs she was actively applying for (i.e. repeatedly requesting reassignment to a vacant position).  *See id.* at PageID.430 ("I feel that I have done everything to reach out to Beaumont and have been flatly denied any type of assistance.").  Again, if Shefke did request specific assistance identifying vacant positions, a jury could easily find a subsequent breakdown of *that* interactive process is attributable to Beaumont because they never took any action on the list they generated; the question is primarily whether Shefke requested that assistance, and on that question reasonable minds could differ.

89

Both motions for summary judgment are therefore ultimately denied as to this position, but the motions are granted in part as to the issues of law and fact that the court has identified.

### c.    Care Coordinator (CCB)

Shefke also applied for the CCB position on April 16, 2019, the same day she spoke with Claxton by phone and emailed with Fildew. Like the QIRN opening, this position also appeared on Claxton's list. ECF No. 17-8, PageID.134.  Shefke was interviewed, but Beaumont hired a candidate who was not disabled, though the record does not reflect when exactly this occurred.  ECF No. 17-15, PageID.166. Assuming that, as with the QIRN position, that Beaumont selected someone external for this role before Shefke's application for the POHA/PACU position in June, the POHA/PACU application is irrelevant to determining Beaumont's liability as to this open position, and no settled employee rights would have been at issue by hiring Shefke.[32]

---

[32] Slightly fewer facts are available about this position, so the court assumes similarity with the QIRN position.  *See* ECF No. 17-15, PageID.166 (answers to interrogatories about CCB, position 30115849).  These points are not critical; the material disputes of fact are the same, and to the extent any further dissimilarities might create additional factual issues, that only confirms the inadvisability of granting summary judgment for either party at this stage of the proceedings.

90

Liability as to this position largely tracks the previous section. For all the reasons stated above as to the QIRN vacancy, *see supra* Section IV.C.v.b, whether Beaumont was on notice of Shefke's CCB application, whether Claxton ought to have been aware of it, whether Beaumont fulfilled its obligations in the interactive process, and whether Shefke fulfilled her obligations under the interactive process, are all material disputes of fact on which a reasonable jury could disagree.  And similarly, whether Shefke requested specific assistance in identifying a job like this one is a question of fact for the jury which would independently establish liability.

Here, the court simply points out two additional material dispute of fact unique to this position.  First, unlike with the QIRN position, there are no exhibits specifically tending to show that Claxton affirmatively received some kind of electronic notice of Shefke's application.  *See* ECF No. 18-19, PageID.492 (QIRN application referencing messages to Claxton).  For all that the EEOC argues that Claxton was generally in charge of recruiting for these positions and should have been aware of Shefke's applications, *see* ECF No. 23, PageID.734, the evidence on that point is mixed – his testimony refers

91

to what he did generally, not in regard to this specific application, and there is no specific testimony or evidence clearly establishing that Claxton did or did not have actual knowledge of Shefke's applications to anything other than the CCA position.  *See, e.g.*, ECF No. 17-19, PageID.256-57 (Claxton Dep.); *but see* ECF No. 18-13, PageID.437 (in reference to her CCA application, "I would have had access if she applied.  If she applied, yeah, I would have access.").

Second, Beaumont alleges the person they hired had the "requisite Care Management experience" as compared to Shefke.  ECF No. 17-15, PageID.166 (answer to interrogatory).  The ADA compels consideration of reassignment, "but also allows an employer to consider legitimate nondiscriminatory prerequisites to jobs, such as the requirement of prior experience . . . ."  *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 694 (7th Cir. 1998) (quoting *DePaoli v. Abbott Labs.*, 140 F.3d 668, 675 (7th Cir. 1998)).  It is not clear, however, what "the requisite Care Management" experience means or what made this a genuine "requirement" of the job.  *See Rorrer*, 743 F.3d at 1039-40 ("Written job descriptions are [] not dispositive.").  While an employer is entitled to define the job in question, merely saying something is a genuine

92

prerequisite is not sufficient to render it truly essential.  *See Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1191 (10th Cir. 2003) ("[A]n employer may not turn every condition of employment which it elects to adopt into a job function, let alone an essential job function, merely by including it in a job description."); *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 929 (7th Cir. 2001) ("There is, on this record, a jury question as to whether an employment history demonstrating responsibility, safety and dependability was a genuine requirement for the position . . . ."); *Mashni v. Bd. of Educ.*, No. 15 C 10951, 2017 U.S. Dist. LEXIS 141706, at *40 (N.D. Ill. Sep. 1, 2017) ("the so-called 'legitimate prerequisites' that the Board claims Mashni failed to meet are also unsupported by the record").

Other than in an answer to an interrogatory, neither party advances any evidence on this point, so the court has no evidence to evaluate (nor, unlike the other roles, does the court find that party admissions or failure to respond foreclose the issue).  *See* ECF No. 20, PageID.643 (admitting that "Beaumont admits that Shefke never asked

Fildew to be placed in a position that she was not qualified for").[33]  It is

not clear what experience this other candidate had specifically, nor is it

clear why Shefke's experience as a Unit Shift Lead and attendant

supervisory duties with Beaumont would not qualify as meeting the

requirement of "care management" experience (particularly when

Shefke also had that experience within the Beaumont hospital system).

And while Beaumont could legitimately consider job experience

prerequisites, Beaumont has never otherwise specifically argued that

Shefke was not "otherwise qualified" for this position, so a jury could

discount their argument.  Thus in addition to the other disputes of fact,

a jury could also – on this vacancy alone – reasonably disagree whether

---

[33] That admission, as well as defense counsel's concessions at oral argument, could be seen to foreclose argument on this CCB position, whatever Beaumont said in its discovery responses about Shefke lacking the "requisite" experience.  In the court's view, however, the inconsistency between their admission that she "never asked Fildew to be placed in a position she was not qualified for," and the statement in the answers to interrogatories about the CCB role specifically, raises enough of a question that the court is hesitant to find the issue forfeited or admitted in some way, particularly where the EEOC's representations about Shefke's qualifications *generally* don't necessarily speak to her qualifications for this role *specifically*. Beaumont argues elsewhere that Shefke only ever "asked" Fildew to be placed in the CCA and POHA/PACU position, so there's a fair argument that their admission doesn't apply to the QIRN/CCB/CN roles at all.  As to the QIRN and CN roles, however, Beaumont never raised the spectre of Shefke lacking qualifications.  *See* ECF No. 18-17, PageID.455 (QIRN); ECF No. 18-17, PageID.457 (CN).

Shefke was or was not qualified for the position by meeting the legitimate, nondiscriminatory prerequisites of the job.

The motions for summary judgment are likewise denied as to this position, though are granted in part as to the issues of law and fact that the court has identified.

d.    POHA/PACU Clinical Nurse

The EEOC does not argue that Shefke should have been placed in the POHA/PACU position, ECF No. 21, PageID.671, and so there is no dispute that Beaumont did not violate the ADA in not selecting her for that position (because she withdrew from consideration, ending the interactive process as to that role).  The relevance of this series of events to the remaining issues is only whether Shefke's withdrawal from consideration is relevant to Beaumont's liability for the four other roles.  As far as Beaumont still seeks summary judgment on this issue, their motion is granted as unopposed as to her application to the POHA/PACU position; Beaumont's arguments as to whether their assistance in getting Shefke an interview for this position satisfied their obligations under the ADA generally are addressed elsewhere.

95

However, as a reminder for the remaining discussion, Shefke

applied for the POHA/PACU position on June 8, 2019.  Upon learning of

Shefke's application to the POHA/PACU position, Fildew contacted the

hiring manager and informed her of Shefke's application.  ECF No. 21,

PageID.671.  The hiring manager sent an email to Shefke indicating

Shefke hadn't contacted her and urging her to reach out: "I have not

heard back from you, I was wondering if you are still interested in the

position?  If so I would like to set up an interview with you. Please

contact me to schedule an interview as soon as possible."  Shefke

responded by stating that she was no longer interested in pursuing the

position as she anticipated going out on a medical leave and thought it

would be "unfair to switch to a new department and then need excessive

leave.  ECF No. 17-13, PageID.155.

       e.    Clinical Nurse (CN)

Shefke applied for the CN position on July 23, 2019.  ECF No. 18-

20, PageID.622.  Shefke was interviewed, but that opening "was

awarded to a displaced internal RN."  ECF No. 17-15, PageID.166.[34]

---

[34] As stated earlier, the hiring of a "displaced internal RN" might raise the
issue referenced in *Burns* that a reasonable accommodation need not "displace

96

A few things differentiate this position from the QIRN and CCB applications in April.  The major points turn on timing; Shefke applied to the earlier positions discussed in April, 2019, while actively communicating with Fildew and Claxton.  In contrast to the frequent back-and-forth at that time, the record does not reflect contemporaneous communication between Shefke and Fildew in July 2019 (there are no emails or phone calls referenced in the record that month at all).  Unlike the QIRN and CCB positions, there is no evidence that Claxton had identified this position as a potential fit for Shefke in his list of available positions, so there is also less of an inference that Beaumont ought to have been on constructive notice of her application.  *See* ECF No. 18-12, PageID.435 (list of vacancies).  Nor is there evidence that Claxton actually received notice of her application.

---

existing employees from their positions" or otherwise interfere with certain pre-vested rights of other employees.  *See Burns v. Coca-Cola Enters.*, 222 F.3d 247, 257 (6th Cir. 2000) ("nothing in the ADA requires an employer to abandon its legitimate, nondiscriminatory company policies defining . . . entitlements to intra-company transfers."); *id.* ("We do not, however, hold that the employer must . . . displace other employees' rights to be considered in order to accommodate the disabled individual.").  If Beaumont had a policy of making sure to reassign displaced employees (rather than letting them go), that policy might reasonably occasionally conflict with reassignments-as-accommodations, depending on the specific facts put forward.  However, because the court concludes that Defendant is entitled to summary judgment as to this opening on other grounds, the court does not address this point further.

Shefke's application to the CN opening occurred after her "third" accommodation request with new paperwork. *See* ECF No. 17-10, PageID.142 (email from Shefke providing new medical form on June 3, 2019); ECF No. 17, PageID.92 (statement of facts, referencing the form as: "Shefke Submits a New Reasonable Accommodation Request Form"). The record reflects that submitting that paperwork seems to have triggered a renewed conversation between Shefke and Fildew. ECF No. 17-11, PageID.147 (email from Fildew on June 12, 2019). A factfinder could consider that relevant to showing that Shefke had now completed all the steps asked of her by Beaumont, *see* ECF No. 18-11, PageID.431 ("Please have your health care provider complete the attached Medical Inquiry form to assist us with that [transfer] process").[35] However, also in that email on June 12, Fildew informed Shefke, "If you apply for anything further or need assistance, please let me know and I would be happy to assist you with this process." *Id.*

---

[35] That said, the point seems only marginally relevant, since Beaumont never argues that Shefke actually needed the medical form in hand to apply to open positions. *See* ECF No. 17-18, PageID.237 (Fildew Dep. at 55-56) ("So she could still apply so long as she was – from your perspective, so long as she was keeping you informed of job openings that she was interested in, it wasn't as important to have the form in hand yet . . . ?" "A: Correct. So you're always eligible to apply, right, . . .").

(emphasis added).  At that point, then, Shefke's argument that she was not required to inform Beaumont of positions that she applied to applies with less force.  While Beaumont's *prior* communications to Shefke allegedly only indicated that all she needed to do to show her interest was apply, after June 12, Shefke was on notice of a legitimate, nondiscriminatory requirement that she needed to let Fildew know if Shefke "applied for anything further" in order to give Fildew a head's up.  *See Burns v. Coca-Cola Enters.*, 222 F.3d 247, 258 (6th Cir. 2000) ("[a]llowing Burns to recover despite his failure to abide by KCC's non-discriminatory policy requiring him to apply for a transfer to a new position within his restrictions" would not be consistent with the ADA).  But maybe most importantly, unlike the earlier applications, Shefke applied to the CN position *after* she had withdrawn from consideration from the POHA/PACU position, which she did on the basis that she planned on needing "excessive leave," and apparently did not communicate with Fildew again (or, at least not in July 2019).  Beaumont argues that cut off their liability because they thought she was no longer interested in seeking a new position.  *See* ECF No. 20, PageID.647 ("Fildew did not know that Shefke was still interested in

transferring to another position because when Shefke withdrew from

consideration for the POHA/PACU position in June 2019, she stated

that she anticipated going out on a medical leave and thought it would

be 'unfair to switch to a new department and then need excessive

leave.'").

Ultimately, the court agrees with Beaumont; as to the CN

position, the facts are "so one-sided" that the court finds that no

reasonable jury could find that Beaumont violated the ADA for failing

to place Shefke in that role.  *See State Farm Fire & Cas. Co. v.*

*McGowan*, 421 F.3d 433, 436 (6th Cir. 2005).  Shefke was told in June

2019 that she needed to tell Beaumont about any applications she made

from that point on, but there is no evidence she did so as to this

application, and unlike the facts above, there are far fewer facts

suggesting Beaumont ought to have been on constructive notice of her

application (such as contemporaneous conversations where Shefke said

something like "I'm applying actively but not getting anywhere").[36]

---

[36] As opposed to earlier, when Shefke *was* in communication with Fildew and
Claxton, she testified several times that "during meetings and on phone calls, I
made everyone aware I'm applying for jobs and interviewing and I'm not getting
anywhere."  ECF No. 17-17, PageID.206 (Shefke Dep. at 125); *see also id.* at
PageID.211 ("in all these back-and-forths, I definitely let them know that I was

Further, in her most recent application (to the POHA/PACU position in June), where Beaumont admittedly *had* attempted to assist Shefke, she withdrew on the basis that she apparently planned to be on extended leave, and never followed up with Fildew after that.  At that point, the blame for cutting short the interactive process of finding a suitable vacant position undoubtedly lay with Shefke.  Given that Shefke's last communication with Beaumont was withdrawing from consideration for the POHA/PACU position and indicated that she "may be out on a medical leave soon, and think that it would be unfair to switch to a new department and then need excessive leave," Beaumont was not on notice that she still needed assistance identifying vacant positions or that she still needed help effecting a transfer.  The duty, therefore, to re-start the interactive process was on Shefke, and no reasonable jury could conclude otherwise.  Beaumont's motion for summary judgment is therefore granted as to the CN position.

## V.    CONCLUSION

---

applying for and not getting anywhere with my -- with my interviews.").  A factfinder could reasonably conclude that those conversations put Fildew (or Claxton) on notice that Shefke had outstanding applications that they could and should look up – but the record does not reflect *any* conversations between Shefke and Fildew after Shefke withdrew from consideration for the POHA/PACU position on June 27, 2019.

Therefore, the court **GRANTS** each motion for summary judgment **IN PART** in accordance with the above, and **DENIES** the motions on any remaining point.

This is not a final order and does not close the case.  A scheduling order will be issued for remaining pretrial dates and trial.

**SO ORDERED**.


Date: July 2, 2025                    s/F. Kay Behm
                                      F. Kay Behm
                                      United States District Judge